# EXHIBIT 1



# POOL AGREEMENT

THIS POOL AGREEMENT (the "Agreement") is made as of the 31st day of July 2015, by and among:

1. RIDGEBURY KILO LLC (the "Participant"), a limited liability company incorporated under the laws of the Marshall Islands with its office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH96960, and
2. HEIDMAR INC. (the "Agent"), a corporation existing under the laws of Marshall Islands, with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH96960, and
3. SEAWOLF TANKERS INC., a corporation existing under the laws of Marshall Islands, with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH96960 (the "Pool Company").

WHEREAS:

a) The Pool Company facilitates a tanker vessel pool ("Seawolf Tankers" or "Pool") formed of vessels that have been or may in the future be committed to the Pool on terms and conditions materially identical to this Agreement; and
b) The Agent is generally appointed to manage the commercial business of the Pool; and
c) The Participant desires to enter the vessel *M/T Ridgebury Progress* ("the Vessel") into the Pool; and
d) The Pool Committee has agreed to accept the Vessel into the Pool; and
e) Contemporaneously herewith the Participant and the Pool Company have entered into a time charter party in the SHELLTIME 4 form (as amended) (the "Charter Party"):

ACCORDINGLY, the parties hereto agree as follows:

## I  GENERAL CONDITIONS FOR PARTICIPATION

A) All vessels entering the Pool are to be delivered as agreed. In the case of a newbuilding, the Vessel may enter the pool upon delivery from the shipyard.

B) No vessel which cannot trade USA, either for regulatory reasons or corporate policy, will be allowed to enter, or remain in, the Pool, unless it is recommended by the Agent, after obtaining the Participant's approval, that such vessel should enter or remain in the Pool and such recommendation is then approved by a majority vote of the Pool Committee. Any such vessel that may be permitted entry to, or remain in, the Pool will be subject to annual periodic reviews of her contributions vs. distributions to ensure her technical rating is commensurate with her overall



contributions. The vessel's technical rating may be adjusted by the Pool Committee, either up or down, as warranted, by majority vote. The vessel in question will not be counted as part of the deciding votes for purposes of determining if the vessel should remain in the Pool.

C) To enter the Pool vessels must be less than 16 years old. Vessels must be withdrawn from the Pool before they turn 20 years old. However, in either case, the Agent may recommend, after obtaining the Participant's approval, that a vessel failing to meet these criteria should enter or remain in the Pool and provided such recommendation is then approved by a majority vote of the Pool Committee, pool participation may be permitted. Any such vessel that may be permitted entry to, or remain in, the Pool will be subject to annual periodic reviews of its contributions vs. distributions to ensure its rating is commensurate with its overall contributions. The vessel's rating may be adjusted by the Pool Committee, either up or down, as warranted, by majority vote. The vessel in question will not be counted as part of the deciding votes for purposes of determining if the vessel should remain in the Pool.

D) The Agent has the right to inspect each offered Vessel to determine its fitness to become a Pool Vessel.

E) The Agent has the right to reject an offered Vessel in it sole and absolute discretion.

## II    TERM

This Agreement shall commence as of the date the Vessel enters the Pool and shall continue unless terminated or the Vessel is removed from the Pool pursuant to the terms of this Agreement, provided that the rights and obligations of the parties under Articles V(F), VIII(C), XVI and XX shall survive the termination of this Agreement and/or the removal of the Vessel from the Pool.

## III    AGENT'S UNDERTAKINGS

A)    In consideration of the commission in respect of the Vessel, the Agent undertakes to perform the following duties in relation to the Vessel:

1)    To be responsible for marketing services on behalf of the Pool, including but not limited to negotiating and concluding time charters, voyage charters, and contracts of affreightment.

2)    To be responsible for the commercial operation of the Vessel including supervising and arranging bunkering, appointing sub-agents and negotiating tugboat service contracts, to include period contracts for such services.

3)    To arrange the scheduling of the Vessel according to the terms of the Vessel's employment.

4)    To carry out all necessary communications with the Vessel, Participant/manager, shippers, charterers, receivers, agents and others



involved with the receiving and handling of the Vessel at the loading and discharging ports, including notices required under the terms of the Vessel's employment.

5) To approve Letters of Indemnity ("LOIs") provided that such LOIs are in conformity with the Charter Party.

6) To collect, on behalf of the Pool Company and in the name of the Pool Company, all freights and accounts receivable arising from operation of the Vessel, to give receipts therefore, to make any and all claims for monies due to the Pool Company and to issue releases upon receipt of payment of such claims and in connection with the settlement of such claims. All funds derived from the employment of the Vessel shall be deposited by the payers to the Pool Company's account in accordance with the Pool Company's written instructions to Agent and the payers thereof. All funds received by Agent from any other source for the account of the Pool Company shall be immediately deposited to said account of the Pool Company. In the receipt and handling of any funds of the Pool Company, Agent shall have fiduciary responsibilities with respect thereto in accordance with normal vessel agency practices and applicable law. Any discounts or rebates that are, or become, available are to be credited to the Pool Company.

7) To institute, defend, intervene in, settle, compromise or abandon any legal proceedings by or against the Pool Company or its freight, earnings and disbursements, and for the purposes of this clause the expression "legal proceedings" shall include arbitration, civil, regulatory and criminal proceedings of all kinds.

8) To furnish the Master of the Vessel appropriate voyage instructions, to monitor voyage performance, speed, and use of weather routing services if deemed necessary by Agent.

9) To maintain such records, accounts, statements and supporting vouchers, if any, obtained in connection with the services covered by this Agreement and make them available to the Pool Company upon request, including, but not limited to, any of the foregoing which the Pool Company deems necessary or advisable in order to comply with any of the charters in effect with respect to the Vessel.

10) To submit such financial and business reports and other information relating to the provision of Agent's services under this Agreement as the Pool Committee may reasonably require and in such form as may be agreed.

11) To procure bunkers from bunker brokers or directly from suppliers.

12) To decide on all matters that do not require a decision of the Pool Committee.

13) To cause full and accurate accounts of the transactions of the Pool

3

Company to be kept in accordance with good accounting practices.

14) To make decisions on the chartering of the Vessel on a voyage basis and on a time-charter basis for periods up to and including 1 year.

15) To make decisions to charter 3rd party vessels on a voyage charter basis or time charter basis into the Pool for a period of up to and including 365 days.

16) To make decisions to fix contracts of affreightment on behalf of the Pool up to and including 12 months.

17) The Agent is to monitor the contributions and distributions for the various classes/ages of vessels. A summary of contribution/ distribution breakdowns is to be provided at a minimum to the Participant on a quarterly basis. If there proves to be consistent differences in earnings compared to distributions for a specific class of vessels over a minimum period of 12 months to the detriment or favor of respective classes in excess of 10%, and this difference can be reasonably attributed to the specific characteristics of the respective class of vessel (i.e. not to chartering tactics or trading patterns and employment that the agent chose for some reasons but subsequent market conditions distorted those intentions), then on an "as warranted" basis, the Agent is to propose amendment(s) to the technical rating points to rectify this discrepancy. The change of rating, if approved, is to be effective 30 days hence or the first day of the next quarter whichever is deemed the most practicable by the Agent.

   The above notwithstanding, should there occur a significant change in the market due to regulations and/or the market, the Agent is obliged to propose a change without delay.

B) In the performance of its duties, Agent shall:

1) Only be required to spend the amount of time and attention on the Vessel that an agent would reasonably be expected to spend in the proper discharge of its duties hereunder and shall not be restricted from carrying on or being concerned or interested in other enterprises (either for its own account or on behalf of other parties for whom it may be acting as agent) as long as such other enterprises are not in conflict with the business of the Pool.

2) Be under no liability whatsoever for any costs, expenses, losses, claims or damages of whatsoever nature (including loss of profit due to detention or delay to the Vessel) arising in the course of the performance of its duties resulting from any act of Agent's personnel, representatives, independent contractors or other persons employed by it, unless the same shall be proved to have resulted from the actual personal willful misconduct of an officer or director of Agent, and the Pool Company and Participant hereby undertake to indemnify and hold Agent harmless from any and all actions, claims, demands and liabilities to or from third parties (including subcontractors, servants and sub-agents in respect of any claim made by

4



or on behalf of them) brought against Agent in the course of the performance of its duties under this Agreement.

3) Only be obliged to pay all sums payable in respect of the Vessel to the extent that Agent holds funds of the Pool Company for such purpose.

4) Not borrow from any of its affiliates to meet any shortfall in working capital.

## IV PARTICIPANT'S UNDERTAKINGS

A) Participant's commitment of vessels

1) All charters applicable to Vessel for a duration of up to and including 2 years exclusive of any +/- tolerances will be the sole responsibility of the Pool Company and will not be worked by Participant. The fixing of such charters to be in accordance with the terms of this Agreement. The Pool Company shall not work any charter, which would exceed a two year period.

2) Any charter exceeding 2 years, exclusive of any +/- tolerances, may be worked individually by Participant. Should such charter be fixed, Participant will have the option of removing the Vessel as per the terms of this Agreement, or maintaining it in the Pool subject to agreement of the Pool Committee. Provided Participant maintains other vessels in the Pool, the Vessel may reenter the Pool at the termination of the charter, assuming it is still an eligible Vessel as per the Pool criteria.

3) Should Participant negotiate any charter unilaterally for the Vessel for a period less than 2 years, exclusive of any +/- tolerances, all of the Participant's Vessels will be removed from the Pool.

4) Should Participant choose to work period business independently as permitted by this Agreement, it is free to request the services of Agent to act on its behalf for such business. Agent must then advise the Pool Committee of such request. Should any other Participant respond that it is felt that this would be a conflict of interest, Agent will not involve itself in this business. Barring any negative response from any other Participant within 7 days, Agent is free to represent Participant should Agent so desire. Participant shall pay for such representation separately.

B) Participant undertakes to perform the following duties:

1) To indemnify and hold Agent and/or its appointed agent harmless from all consequences or liabilities in complying with orders given to it.

2) To ensure that the Vessel shall be insured in accordance with normal shipping practice with first class underwriters. Such insurance shall include P&I, hull and machinery and war risk insurance.

3) To time charter the Vessel to the Pool Company for an initial period of 6



months (period may be less if agreed by the Pool Committee) after which the Charter Party becomes evergreen. After the initial period, however, the Vessel may be redelivered by either Participant or the Pool Company within the redelivery area(s) and after giving 90 days written notice. Such notice may not be given prior to the end of the initial period. Once a redelivery notice has been given by either party, the other party may choose to redeliver the Vessel or request the redelivery of the Vessel, as the case may be, at any time after receipt of the redelivery notice, as long as the Vessel is free of any commitment and after serving a minimum of 7 days notice, which is to include the name of the redelivery area.

4) To immediately notify Agent in writing of Participant's decision to sell the Vessel. The Vessel may not be removed from the Pool by Participant for minimum 30 days from the issuance of such notice. Upon receipt of such notice from Participant, Agent will endeavor to employ the Vessel in such a way to facilitate the delivery of the Vessel to the new owners. Subsequent to the 30 day required notice period, the Vessel will be removed from the Pool when she is next free of cargo and in accordance with the terms of the Charter Party. If the Vessel completes discharging in an unallowable redelivery area, however, Participant has the option to take redelivery of the Vessel in such area or to allow the Pool to continue to trade the Vessel until it completes discharge in a redelivery area permitted by the Charter Party.

5) To pay the Termination Fees required upon the termination of a Vessel from the Pool in accordance with Article VIII C) of this Agreement.

6) To engage a professional consultant for the establishment of an "Incident Response Program". The Pool Company and Agent are to be included in, and be the beneficiaries of, the program.

7) To contribute USD 2,000,000 in working capital per vessel. The net working capital contribution to be deducted from the first hire payment(s), unless otherwise agreed. The working capital contributions per vessel may be adjusted from time to time subject to the agreement of the Participants. When the Vessel leaves the Pool, any working capital contributions, withheld in connection with this section, will be repaid with the last hire payment.

## V    POOL COMPANY'S UNDERTAKINGS

The Pool Company undertakes to perform the following duties:

A) To indemnify and hold Agent and/or its appointed agent harmless from all consequences or liabilities in complying with orders given to it.

B) To pay for and/or reimburse Agent for all costs, disbursements, and expenses whatsoever incurred by Agent in the performance of its duties. Such disbursements and expenses shall include, but shall not be limited to, the fees and expenses of independent consultants, professional advisors and representatives, supercargo, port captains, surveyors, superintendents or other specialists, whom Agent

6



considers desirable to employ from time to time in connection with the operation of the Vessel. Such expenses are to be considered voyage expenses and prorated between all vessels in the Pool, if appropriate. If Agent's operational personnel and/or port captains are sent to attend the Vessel from Agent's office, only travel and out of pocket expenses are to be reimbursed by the Pool and charged to the applicable voyage(s).

C)   To procure time charterers' protection and indemnity ("P&I") (from a major P& I club), freight demurrage and defense ("FDD"), bunker insurance and loss of freight insurance.

D)   To engage a professional consultant for the establishment of an "Incident Response Program" to mitigate any commercial exposure to the Pool as a result of an incident involving the Vessel.

E)   To withhold USD 500,000 of charter hire when the Vessel is withdrawn from the Pool by Participant. Such amount will be held until the new Vessel ratings, if any, for the semi-annual period in which the Vessel is withdrawn from the Pool, are approved by the Pool Committee. The Pool will remit any balance of charter hire due to the Participant within 30 days of the Pool Committee's approval of the new Vessel ratings or the Pool Committee's decision not to change the Vessel's rating. Notwithstanding the provision of the previous sentence, in no event will the final payment of charter hire be made later than the six month anniversary of the end of the semi-annual period in which the Vessel was withdrawn. The Pool will not withhold charter hire on the Vessel if Participant, either directly or indirectly through affiliated companies, provides the Pool Company (in a form satisfactory to Agent) with the written right of off-set (in the event of the overpayment of charter hire to the Vessel) of charter hire from other vessel(s) entered by Participant in the Pool.

F)   In the event that there is a cargo contamination caused by the Pool Vessel which results in demurrage or other claim(s) being unpaid with reference to such contamination, the Participant will take action to bring the cargo claim to a resolution as soon as possible. In the event no resolution has been achieved by the Participant by the time the Vessel gives notice to leave the Pool, then the Agent shall have the authority at that time to deduct an amount from charter hire equal to the amount being withheld by the sub-charterer under the claim. This amount is to be in addition to the USD 500,000 that is withheld under paragraph E above. The Pool, however, will not withhold charter hire on the Vessel if the Participant, either directly or indirectly through affiliated companies, provides the Pool (in a form satisfactory to the Agent) with the written right of off-set (in the event of the overpayment of charter hire to the Vessel) of charter hire from other vessels in the Pool.

VI   ~~AGENCY FEE~~
Deleted


VII   COMMISSION

Agent shall receive a commission fee from the Pool Company equal to one and three quarters per cent (1.75%) calculated on the gross freight, demurrage, deadfreight,

miscellaneous revenues and charter hire obtained for the employment of the Vessel or on contracts or charter parties entered into by the Pool Company during the term of this Agreement in accordance with Article IIIA)15), payable to Agent on the dates when such freight, demurrage or charter hire, as the case may be, is paid. Any change in amount of commission to be agreed by the Pool Committee.

## VIII    TERMINATION

A)    This Agreement will terminate if any party dissolves or liquidates or if an order be made or effective resolution be passed winding up either party or if a receiver shall be appointed for the property of any party or if any party shall cease to carry on its business or commences a proceeding in bankruptcy or similar proceeding (or a proceeding in bankruptcy or similar proceeding is commenced against a party which proceeding remains undismissed and unstayed after thirty (30) days) or if a party makes any special arrangements or composition with its creditors.

B)    The Pool shall not be terminated until all contractual obligations, entered into by the Pool Company, have been fulfilled.

C)    Upon termination or removal of the Vessel from the Pool, a Termination Fee of $375 per day will be charged for 30 days from the day that the Vessel leaves the Pool. Thereafter, the Termination Fee will be reduced by 50% (fifty per cent) and continue for 90 days. This is to cover operational and accounting costs of finalizing the Vessel's disbursements, demurrage, etc. Such Termination Fees to be paid by Participant.

## IX    ASSIGNMENT

Agent, subject to obtaining written consent, which shall not be unreasonably withheld, from the Pool Company and Participant, may assign this Agreement to any of its affiliates. In the event of such a transaction, however, Agent shall always remain responsible for the fulfillment of this Agreement in all its terms and conditions.

## X    HIRE

The Vessel will earn charter hire in accordance with the Pool Point Formula explained in Article XIII of this Agreement. Hire is preliminarily scheduled to be paid monthly in arrears and bunkers on board at the time of delivery to be paid for with first hire payment. Preliminary charter hire will be based on the Pool's then current earnings and is not a guaranteed minimum rate obligation of the Pool Company. Hire is inclusive of overtime, communication, and victualling. The preliminary charter hire may be adjusted either up or down as necessary by the Pool Committee depending on the prevailing market condition of the Pool. The Pool Company will strive to maintain the monthly payment of hire schedule, only adjusting the hire as dictated by the cash flow of the Pool Company.

It is understood that the Pool has time chartered the participating vessels with the overall intention of maximizing the earnings of each vessel. Each vessel's monthly charter hire

payments will be adjusted to reflect the then-current earnings of the Pool, the actual operating days of each vessel in the Pool and the then-current ratings of each vessel in the Pool, as defined in the Pool Formula in Article XIII hereof. Such monthly adjustments will be added or subtracted from each vessel's charter hire payment in the second succeeding month.

## XI    ACCOUNTING

Participant will receive a complete and detailed report monthly outlining what the Pool has earned since the last report, a cumulative year-to-date report, a Pool cash balance statement and actual voyage results specific to Participant's Vessel(s) indicating voyage results and Pool contributions.

Deloitte Touche or other major international accounting firm, on an annual basis, will audit the Pool Company's books, including distributions. Audited reports will be distributed to all Participants. All Pool records are available for review by each Participant at the offices of Agent.

## XII    POOL POINT RATING

The Vessel will receive a Pool Point Rating based on the cumulative sum of the characteristics set out in Annex 1 hereto. The Pool Committee may, with majority vote, adjust or amend the criteria and/or rating points for determining a vessel's Pool Point Rating.

## XIII    POOL POINT FORMULA

The allocation of a participating vessel's pool earnings is determined in accordance with the following Formula:

1) The sum of the rating points of all participating vessels is divided by the then current number of vessels in the Pool, producing the "Average pool rating".

2) Each individual vessel's rating is then divided by the "Average pool rating", producing "Vessel pool points".

3) Each vessel's actual operating days in the Pool is divided by the total actual operating days of all vessels in the Pool, producing "Vessel percent of total pool days".

4) The rating for each vessel is multiplied by the "Vessel percent of total pool days" for each vessel, producing "Vessel rating adjusted for days in pool".

5) Each individual "Vessel rating adjusted for days in pool" is divided by the total "Vessel rating adjusted for days in pool" producing "Pool points adjusted for days in pool."

6) The total earnings/losses of all Pool vessels, including vessels chartered in by the Pool, and net of Pool general and administrative expenses, is multiplied by the "Pool points adjusted for days in pool", producing "Weighted pool distributions by vessel".

The net earnings that each vessel contributes to the Pool shall be calculated as follows:

> *gross freight/revenue/demurrage/dead freight
> *less any broker commission
> *less Agent's commission
> *less voyage costs (port/canal/bunkers etc)
> *less the Agent's share of any salvage money
> *less COFR/OPA/VRP etc., if applicable
> *any other applicable costs which include, but is not limited to inspections, cleaning costs, chemicals, and expenses per Article V B) of this Agreement.

This Pool Formula can be adjusted by the Pool Committee from time to time as dictated by the market, changes in trading pattern, vessels, etc. Participant to be advised prior to any changes to the formula.

Should a vessel obtain time charter business for a minimum of 90 days solely due to specific characteristics unique to that vessel, then the Pool Committee may increase the vessel's technical rating or charter hire for the duration of that business to reflect the associated contribution of that vessel's earnings to the Pool.

## XIV VETTING

1) In order to enter the Pool, Participant must have submitted a valid TMSA to OCIMF/Sire, and also an updated/acceptable officer matrix (criteria attached) for the Vessel.

2) Unless the Vessel is a Newbuilding (see Paragraph 10.vi), there must be on file a "Good" Sire Report which is no older than six months at the time of entry.

A "Good Sire Report" is one that meets the following criteria:

   (i)   No "High Risk Observations" as set out in BP's High Risk Observation list
   (ii)  Inspection done during discharge
   (iii) Satisfactory responses from owners addressing root cause, corrective action and preventative measures

3) At the time of entry into the Pool, there are no trading rejections/restrictions on the Vessel from any of the following oil majors: Chevron, ExxonMobil, BP, Shell, Total, Conoco, Statoil or Vela.

4) While entered in the Pool, Participant shall at all times make best endeavors to ensure that the Vessel is eligible for charter to as many oil majors (including, but not limited to, the eight listed in para. 3) and oil traders as possible.

5) Participant shall, during the Vessel's participation in the Pool, make necessary arrangements so that the latest "Good" Sire Report is never more than six months

10

old. If the last "Good" Sire Report exceeds six (6) months, the Vessel's technical rating shall be reduced by 5 points on the six month anniversary date of last Good Sire inspection. This reduction in rating shall remain in place until a "Good" Sire Report has been entered into the Sire system with all outstanding questions or comments replied to and accepted by the inspecting oil company. Copy of Sire report with Owners comments must be sent to the Agent as soon as possible.

6) If Participant can demonstrate to the Agent's satisfaction that it was not possible to take the necessary steps at any previous port or by a time which would have brought the Vessel within compliance with paragraph 5) hereof, and provided the Agent agrees, Participant will have a maximum of 45 days or 1 discharge port, whichever is later, to arrange for compliance. During this period, there will be no reduction of points.

7) The Vessel must at all times be eligible for charter by a minimum of four oil majors listed in para. 3. Should the Vessel's eligibility fall below the required level, the Vessel will remain in the Pool, but her Pool Point Rating will be reduced by 5 points from the date when it was discovered that the Vessel has lost such eligibility and by an additional 5.0 points for each loss of eligibility after that. The maximum total point deduction is 20 points. Each point reduction will remain in effect until the Vessel's eligibility is reinstated as per the above.

8) The Agent will inform Participant when a reduction in the Vessel's Pool Point Rating is put into effect. Should Participant disagree with the Agents actions, Participant may request that the Agent put the matter before the Pool Committee for a decision by majority vote as to whether the Vessel's rating be reduced. Participant will abstain from voting.

9) In the event the Vessel is involved in an incident which results in a casualty, pollution or machinery breakdown, Participant must take a proactive approach to inform Agent, charterers and oil major/trader vetting departments as soon as possible. Participant must immediately arrange for an incident investigation to be carried out, a report submitted and Participant must demonstrate that same is closed out and the file closed out within 45 days, failing which the Vessel will be considered not eligible until written confirmations are received from the major oil companies/traders to the contrary.

10) A vessel will be considered eligible for charter the earlier of;

    (i)   the date when written approval is received or;

    (ii)   the date a vessel is fixed to a major oil company (even though the oil company may not have officially inspected the vessel or responded to the Participant after the inspection), or the date a vessel is cleared for nomination to a major oil company by a third party and will be valid until the expiration date of the approval (if applicable), or the date on which the vessel is accepted by the major oil company for a proposed cargo or for a clearance nomination by a third party.

(iii)   If a vessel is rejected by a major oil company for a proposed cargo or for a clearance nomination (e.g. due to Crew Matrix, Owners profile, unsatisfactory Sire report, or due to another specific requirement which is integral part of the oil company acceptance criteria) such vessel shall not be considered eligible to the major oil company until the date a vessel complies with subparagraph (ii) above.

(iv)   If a vessel receives a written approval but does not clear the first subsequent nomination, such approval shall be revoked retroactively until the date a vessel complies with subparagraph (ii) above.

(v)    If a vessel is unable to re-obtain the required eligibility within 45 days of having lost the fourth approval, the Agent may either provide Principal with an additional 30 days to re-obtain the required eligibility or recommend to the Pool Committee to have the vessel removed from the Pool. The Principal of the vessel will not participate in a vote to remove the vessel.

(vi)   The requirement for having minimum eligibility for entry into the Pool is waived in the case of newbuildings. For purposes of this agreement, a newbuilding is considered to be a vessel delivered from the yard within the previous 6 months. Such vessel will enter a grace period of 90 days within which the minimum eligibility must be obtained. Owners must arrange for a Sire inspection at the shipyard, the first bunkering port or the first loadport to facilitate a Sire report in the OCIMF Sire system. Owner must also arrange for a subsequent Sire inspection at the first discharge port. If the minimum eligibility is not obtained during this grace period, then Agent shall retroactively reduce the ships rating accordingly from the date the vessel joined the Pool. Agent shall also have the authority to remove the ship from the Pool.

## XV   COMMITTEES AND AUTHORITIES

The Pool Committee: The Pool Committee consists of each Participant who has entered one or more vessel(s) into the Pool. The Pool Committee will meet at a minimum of twice a year to review Pool performance and strategy. Each Participant on the Pool Committee will have one vote per vessel entered in the Pool. Agent, in its capacity as agent, will be a member of the Pool Committee with one vote.

The Pool Committee is empowered to:

1)   Approve any new participant in the Pool by a majority vote.
2)   Review Technical Committee's report and vote on any appropriate changes recommended by the Technical Committee. Majority vote is required on recommended changes.
3)   Review financial accounts and budgets.
4)   Approve any contracts of affreightment in excess of 12 months by majority vote.
5)   Approve chartering of vessels into the Pool, exceeding 365 days in duration, by majority vote.

12

6) Approve chartering of Vessels out of the Pool, exceeding 365 days in duration, by majority vote. Such vote must include the approval of the Participant of the Vessel to be chartered out.

7) Approve changes to Pool Point Rating and/or Pool Point Formula by majority vote.

8) Approve changes to preliminary hire payments or changes to hire payments in arrears by majority vote.

9) Review and approve any increases relating to Agent's remuneration by majority vote. The Agent will abstain from casting its one vote.

10) Approve the removal of a Vessel from the Pool for continued vessel malfunctions or other reasons, which make the vessel unacceptable to charterers and/or terminals or which are deemed to be detrimental to the overall image of the Pool, by majority vote. Once the removal of Vessel has been confirmed by the Pool Committee, unless otherwise agreed by the Pool Committee, the Vessel will exit the Pool not later than 10 days from the date the Agent recommended its removal, regardless of Vessel location. If Vessel is on a voyage, exit will be the later of the 10 day notice or when the voyage completes.

11) Approve an increase in a Vessel's charter hire for time charter business, which was secured based on characteristics that were unique to that Vessel, by majority vote.

Each Pool Committee member must be reachable by phone, e-mail or fax for decisions at all times or leave authority with another member of the Pool Committee. Should a Pool Committee member not respond within one working day, then by default, his vote(s) is to be considered as a confirmation of the recommendation made by Agent to the Pool Committee.

The Technical Committee: The Technical Committee consists of one member per Participant. Each Participant is allotted one vote for each vessel in the Pool. Technical Committee meetings will be held at a minimum of two (2) times a year.

The Technical Committee's mandate is to review the entered vessels' technical performance on a semi-annual basis and to recommend by majority vote any changes in the Technical Rating Points to the Pool Committee. The Technical Committee shall provide a written report to the Pool Committee at least 5 working days prior to each Pool Committee meeting.

## XVI    CONFIDENTIALITY

This Agreement including all terms, details, conditions, and period is to be kept private and confidential and beyond the reach of any third party, with the exception of the lending banks of the Participant or the Participant's agents. The terms and conditions of this Agreement are for the sole use of the parties to this Agreement and are not to be copied or used for any other purpose without the express written consent of the Pool.

## XVII    TOTAL LOSS

In the event of a total loss or constructive total loss of the Vessel, her participation in the Pool shall be deemed to be terminated at noon on the day of her loss or, should the Vessel be missing, at noon on the day on which she was last heard from.

## XVIII    ASSIGNMENT OF EARNINGS

The earnings of the Pool may not be assigned by Participant or Agent. Participant may only assign the charter hire earnings distributed by the Pool pertaining to the Vessel. Participant agrees to (i) an assignment of the earnings and any other receivables of the Pool and/or Pool Company in connection with the borrowing of money to be used as working capital for the Pool and/or Pool Company (and/or for purposes ancillary thereto), and (ii) the subordination of any claims Participant has or may have against the Pool to any and all claims of the Pool's creditors that the Pool determines are valid and undisputed. Participant also agrees to waive any contractual lien over the charter hire earnings distributed by the Pool Company pertaining to the Vessel in favor of such creditor.

## XIX    HEADINGS AND MODIFICATIONS

The headings of Clauses are for convenience of reference only and shall not affect the interpretation of this contract. No waiver or discharge of any term of this Agreement shall be valid unless in writing and signed by the party to be charged therewith.

## XX    ARBITRATION

If any dispute should arise in connection with the interpretation and fulfillment of this Agreement, such dispute shall be decided by English law and shall be referred to a single Arbitrator in London, who will be appointed by the parties hereto. If the parties cannot agree upon the appointment of a single Arbitrator, the dispute shall be settled by three Arbitrators, each party appointing one Arbitrator, and if the dispute is between two parties hereto, the third Arbitrator shall be appointed by the Arbitrators named by each party. If either of the appointed Arbitrators refuses or is incapable of acting, the party appointing him shall appoint a new Arbitrator in his place. Any determination rendered by the Arbitrator(s) shall be final and binding upon the parties and may, if necessary, be enforced by a court of any other competent authority in the same manner as a judgment in a court of law. In any arbitration, the Arbitrators shall use the general maritime law of England to interpret any questions of law.

For any disputes being settled by arbitration, which may require the vote of the Pool committee, the Participant initiating the arbitration or the Participant being brought to arbitration will abstain from such voting.

14

**XXI TAX CLAUSE**

1) Each party confirms the accuracy of the description of it set forth in the introductory paragraph of this Agreement.

2) The Participant confirms that it is the beneficial owner (meaning, for the purpose of this Article, the entity that derives and is entitled to the income) of the charter hire and other payments made to it pursuant to this Agreement and the Charter Party, and (i) is not acting as a nominee, trustee or agent for another individual or entity (ii) is a corporation or other legal entity where all of its members have limited liability and (iii) has not filed for treatment as a pass-through entity with the U.S. Internal Revenue Service. The Participant agrees that upon any change in its circumstances as described in this paragraph, it will notify the Agent immediately.

The Pool confirms to the Participant that, except to the extent that any statement made by the Participant herein is untrue, nothing in this Article shall create a basis for any claim against the Participant or create any additional fiscal or other liability of the Participant in excess of the liabilities which the Participant currently has under the Pool Agreement.

**XXII NOTICES:**

Notices or other communications under or with respect to this Agreement shall be in writing and shall be delivered personally or shall be sent by mail, telefax, or E-mail to the parties at their respective addresses set forth below or to such other address as to which notice is given:

To Participant:
Ridgebury KILO LLC
33 Riverside Avenue, 3rd Floor
Westport, CT 06880
Tel No. (203) 304-6130
Fax No. (203) 304-6141
E-mail: info@ridgeburytankers.com

To Seawolf Tankers Inc.:
c/o Heidmar Inc. as agents
20 Glover Avenue
Norwalk, CT 06850
Tel No. (203) 662-2600
Fax No. (203) 662-2784
E-mail: Bulletin@Heidmar.com

To Agent:
Heidmar Inc.
20 Glover Avenue
Norwalk, CT 06850
Tel No. (203) 662-2600
Fax No. (203) 662-2784
E-mail: Bulletin@Heidmar.com

15

Notice shall be deemed given upon sending except for notice by mail which shall be deemed given upon receipt.

Ridgebury Kilo LLC

By: _____
Robert Burke, CEO

Seawolf Tankers Inc.

By: _____
Benjamin P. Ognibene, CEO

Heidmar Inc.

By: _____
Benjamin P. Ognibene, CEO





## POOL POINT RATING SUMMARY

Effective as of January 1, 2015

All vessels in the Pool will receive a Pool Point Rating based on the cumulative sum of the following characteristics:

1) AGE          POINTS
   (as determined by calendar year)
   0-10 years    5.000
   11-15 years    4.000
   16-20 years    2.000

2) SUPER SLOW SPEED
   Vessel has ability to proceed <9 knots (Ballast leg)   0.500

3) WORLDWIDE TRADE
   Full Worldwide Trade    1.000

4) SPEED/CONSUMPTIONS

   This is based on standard round voyage as follows using vessels initially provided speed and consumption profiles. Once the vessel's time charter equivalent is determined under this formula, it is then multiplied by a coefficient of 90% and divided by 1,000. In other words if the time charter equivalent is USD 15,000, then the vessel would receive an additional 13.500 points (15 x 90%):

   **TD15 (Baltic Index Tanker Route):**
   Load: Serpentina
   Discharge: Ningbo, China

   Cargo Quantity      : 260,000 mts NHC
   Serpentina          : $60,000
   Ningbo Port Costs   : $200,000
   Commission         : 5.5%
   Load/Discharge     : 2 days each
   Bunker Prices       : Singapore (Basis Bunkerworld)



On a semi-annual basis, the actual speed and consumption data will be used and applied to either Vessel's Full, Mid, or Slow consumption profiles, with exclusions for weather, cargo heating, cargo tank purging, cargo tank cleaning, and ballast exchange. Semi-annually, the optimal profile (Full, Mid, or Slow), providing the highest time charter equivalent in the model voyage, basis the prevailing market conditions for that six month period (WS and bunker prices six month average averages) for each Vessel, will be used for rating purposes. For Vessels with insufficient speed and consumption data available during a six month period, sister ship data will be used. If there are no sister vessels in the Pool, an initial rating will be assigned and the final rating will be confirmed when enough actual data is accumulated to verify the profile.

For the Full profile, laden and ballast speeds will be based on Vessel's net performance with a cap placed at 96% of the Vessel's theoretical propeller efficiency.

The following equation will be used to calculate the Vessel's 96% theoretical speed cap:
(((Full Sea Speed RPM x 60 minutes/hour) x (Propeller pitch x 3.2808 feet/meter)) / 6076 feet/nautical mile) x 0.96)

Net performance for speed will be based on time spent on sea passages, excluding periods involving weather of Beaufort Force greater than 5, and whilst under pilotage.

Vessels that have net speeds below the 96% cap will be rated at the actual observed net speed. Vessels that have net speeds above their rated 96% efficiency will be rated basis their 96% efficiency speed.

For new vessels entering the pool, the pool points will be initially based on the vessel's 96% efficiency rating and then adjusted after the accumulation of sufficient data.



# SEAWOLF TANKERS INC.
# AMENDMENT NO. 1 TO POOL AGREEMENT

THIS AMENDMENT NO. 1 TO THE POOL AGREEMENT, ("this Amendment") is made as of the 31st day of July 2015, by and among RIDGEBURY KILO LLC, a limited liability company incorporated under the laws of the Marshall Islands, with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH96960, (the "Participant"), as the owner or operator of the *M/T Ridgebury Progress,* HEIDMAR INC., a corporation existing under the laws of the Marshall Islands with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH96960 (the "Agent") and SEAWOLF TANKERS INC. a corporation existing under the laws of the Marshall Islands with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH96960 (the "Pool").

WHEREAS, the Agent and the Pool have requested and the Participant has agreed to amend certain provisions of the Pool Agreement;

ACCORDINGLY, the parties hereto agree as follows:

Effective November 6, 2012

Section IV, Participant's Undertaking, B) 7), the first sentence to be deleted and replaced as follows:

To contribute USD 2,500,000 in working capital per vessel.

All other terms and conditions of the Pool Agreement shall remain in full force and effect and the Pool Agreement shall be read and construed as if the terms of this Amendment were included therein by way of addition or substitution, as the case may be.

**SEAWOLF TANKERS INC.**

By: _____
Benjamin P. Ognibene, CEO

**RIDGEBURY KILO LLC**

By: _____
Robert Burke, CEO

**HEIDMAR INC.**

By: _____
Benjamin P. Ognibene, CEO



# SEAWOLF TANKERS INC.
# AMENDMENT NO. 2 TO POOL AGREEMENT

THIS AMENDMENT NO. 2 TO THE POOL AGREEMENT, ("this Amendment") is made as of the 31st day of July 2015, by and among RIDGEBURY KILO LLC, a limited liability company incorporated under the laws of the Marshall Islands, with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH96960, (the "Participant"), as the owner or operator of the *M/T Ridgebury Progress*, HEIDMAR INC., a corporation existing under the laws of the Marshall Islands with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH96960 (the "Agent") and SEAWOLF TANKERS INC. a corporation existing under the laws of the Marshall Islands with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH96960 (the "Pool").

WHEREAS, the Agent and the Pool have requested and the Participant has agreed to amend certain provisions of the Pool Agreement;

ACCORDINGLY, the parties hereto agree as follows:

Effective April 21, 2015

Section IV, Participant's Undertaking, B) 7), the first sentence to be deleted and replaced as follows:

> To contribute USD 2,200,000 in working capital per vessel.

Effective July 22, 2015

Section XIV – Vetting be deleted and replaced as follows:

## XIV    VETTING

1) In order to enter the Pool, Participant must have submitted a valid TMSA to OCIMF/SIRE, and also an updated/acceptable officer matrix for the Vessel.

2) Unless the Vessel is a Newbuilding (see Paragraph 12), there must be a Good SIRE Report on file which is not older than four (4) months at the time of entry.

   A "Good SIRE Report" is one that meets the following criteria:

   (i) A low number of observations and no high risk observations identified
   (ii) Inspection done during discharge
   (iii) Satisfactory responses from owners addressing root cause, corrective action and preventative measures

3) At the time of entry into the Pool, there are no trading rejections/restrictions (except regarding age and specific terminal acceptance where the vessel's particulars do not meet certain requirements) on the Vessel from any of the following oil majors: BP, Bahri, Chevron, ExxonMobil, IOC, P66, Shell, Total, or Unipec.



4) While entered in the Pool, Participant shall at all times make best endeavors to ensure that the Vessel is eligible for charter to as many oil majors (including, but not limited to, the nine (9) listed in para. 3)) and oil traders as possible.

5) Participant shall, during the Vessel's participation in the Pool, make necessary arrangements so that the latest Good SIRE Report is never more than four months old. If the last Good SIRE Report exceeds four (4) months, the Vessel's technical rating shall be reduced by 15 percent on the four-month anniversary date of the last Good SIRE report filed. If however the age of latest Good SIRE Report exceeds five (5) months, the reduction in the Vessel's technical rating shall be increased to 25 percent on the five-month anniversary date of the last Good SIRE Report. The reduction in rating shall remain in place until a Good SIRE Report has been entered into the SIRE system with all outstanding questions or comments replied to and accepted by the inspecting oil company. A copy of SIRE report with Owners comments must be sent to the Agent as soon as possible.

6) If Participant can demonstrate to the Agent's satisfaction that it was not possible to take the necessary steps at any previous port or by a time which would have brought the Vessel within compliance with paragraph 5) hereof, and provided the Agent agrees, Participant will have a maximum of 45 days or 1 discharge port, whichever is later, to arrange for compliance. During this period, there will be no reduction of points. However, if the Vessel fails to comply after 45 days or 1 discharge port, the deduction will apply from the original date of non-compliance as per paragraph 5) above.

7) If the Vessel is rejected by a major oil company or trader for a proposed cargo or for a clearance nomination (e.g. due to crew matrix, issue with TMSA, owners' profile, unsatisfactory SIRE report, or due to another specific requirement which is an integral part of the oil company/trader acceptance criteria, except regarding age and specific terminal acceptance where the vessel's particulars do not meet certain requirements), a screening alert will immediately be sent to Participant. From the date of such rejection, the Vessel shall not be considered eligible to the major oil company/trader until the earlier of 1) the date Participant receives a written confirmation from the oil major/trader that the Vessel is again eligible, or 2) when she is accepted for a transaction by the oil major/trader in question.

In the event of any disagreement between the Participant and the Agent as to whether the Vessel is acceptable by an oil major, Participant shall promptly provide Agent, on request, with all relevant correspondence exchanged with the approving party, which is to be kept strictly private and confidential.

The Vessel shall be deemed ineligible if the approving party needs to carry out its own physical inspection. Advice by the approving party that it will refer to the registered valid SIRE report is evidence that a physical inspection is not required, but is not evidence that the Vessel is eligible to the approving party unless subsequently fixed for business with that company.

If the Vessel receives a written confirmation of eligibility but does not clear the first subsequent nomination, such eligibility shall be revoked retroactively until the date the Vessel complies with above.

8) The Vessel must at all times be eligible for charter to a minimum of five oil majors listed in para. 3. Should the Vessel's eligibility fall below the required level, the Vessel will remain in the Pool, but her Pool Point Rating will be reduced by 15 percent from the date of the first loss of eligibility and by an additional 15 percent for each loss of eligibility after that. The maximum total percentage deduction, including deduction for SIRE > 4 months/ > 5 months is 50 percent. Each percentage reduction will remain in effect until the Vessel's eligibility is reinstated as per the above. The Agent shall be mindful of the requirement to nominate vessels to the oil majors in order to facilitate compliance by Participant of this criterion and use reasonable efforts to this end.

9) The Agent will inform Participant when a reduction in the Vessel's Pool Point Rating is put into effect. Should Participant disagree with the Agents actions, Participant may request that the Agent put the matter before the Pool Committee for a decision by majority vote as to whether the Vessel's rating be reduced. Participant will abstain from voting.

10) In the event the Vessel is involved in an incident which results in a casualty, pollution or machinery breakdown, Participant must take a proactive approach to inform Agent, charterers and oil major/trader vetting departments as soon as possible. Participant must immediately arrange for an incident investigation to be carried out, a report submitted and Participant must demonstrate that same is closed out and the file closed out within 45 days, failing which the Vessel will be considered not eligible until written confirmations are received from the major oil companies/traders to the contrary.

11) If the Vessel is unable to re-obtain the required eligibility within 45 days of having lost the third eligibility, the Agent may either provide Participant with an additional 30 days to re-obtain the required eligibility or recommend to the Pool Committee to have the vessel removed from the Pool. The Participant of the vessel will not participate in a vote to remove the vessel.

12) The requirement for having minimum eligibility for entry into the Pool is waived in the case of newbuildings. For purposes of this agreement, a newbuilding is considered to be a vessel delivered from the yard within the previous 6 months. Such vessel will enter with a grace period of 90 days within which the minimum eligibility must be obtained. Owners must arrange for a SIRE inspection at the shipyard, the first bunkering port or the first loadport to facilitate a SIRE report in the OCIMF SIRE system. Owner must also arrange for a subsequent SIRE inspection at the first discharge port. If the minimum eligibility is not obtained during this grace period, then Agent shall retroactively reduce the ships rating accordingly from the date the vessel joined the Pool. Agent shall also have the authority to remove the ship from the Pool retroactive to the date the vessel joined the Pool.

All other terms and conditions of the Pool Agreement shall remain in full force and effect and the Pool Agreement shall be read and construed as if the terms of this Amendment were included therein by way of addition or substitution, as the case may be.

**SEAWOLF TANKERS INC.**

By: _____
Benjamin P. Ognibene, CEO

**RIDGEBURY KILO LLC**

By: _____
Robert Burke, CEO

**HEIDMAR INC.**

By: _____
Benjamin P. Ognibene, CEO

 ORIGINAL

# SEAWOLF TANKERS INC.
# AMENDMENT NO. 3 TO POOL AGREEMENT

THIS AMENDMENT NO. 3 TO THE POOL AGREEMENT, ("this Amendment") is made as of the 27th day of April 2016, by and among RIDGEBURY KILO LLC, a a limited liability company incorporated under the laws of the Marshall Islands, with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Island MH96960, (the "Participant"), as the owner or operator of the *M/T Ridgebury Progress,* HEIDMAR INC., a corporation existing under the laws of the Marshall Islands with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH96960 (the "Agent") and SEAWOLF TANKERS INC. a corporation existing under the laws of the Marshall Islands with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH96960 (the "Pool").

WHEREAS, the Agent and the Pool have requested and the Participant has agreed to amend certain provisions of the Pool Agreement;

ACCORDINGLY, the parties hereto agree as follows:

Effective April 27, 2016

Section IV, Participant's Undertaking, B) 7), the first sentence to be deleted and replaced as follows:

To contribute USD 1,700,000 in working capital per vessel.

All other terms and conditions of the Pool Agreement shall remain in full force and effect and the Pool Agreement shall be read and construed as if the terms of this Amendment were included therein by way of addition or substitution, as the case may be.

SEAWOLF TANKERS INC.

By: _____
James Hurley, Managing Director

HEIDMAR INC.

By: _____
Benjamin P. Ognibene
President & CEO

RIDGEBURY KILO LLC

By: _____

Robert Burke, CEO

# EXHIBIT 2

ORIGINAL

*Issued December 1984*

# Time Charter Party

LONDON. *August 18,* ~~19~~*2015*

IT IS THIS DAY AGREED between **Ridgebury Mike LLC**                                                    1

of **the Marshall Islands**                                   (hereinafter referred to as "Owners"), being owners of the    2

good **motor**                          vessel called **Ridgebury Purpose**                                               3

(hereinafter referred to as "the vessel") described as per Clause 1 **+ 43** hereof and **Seawolf Tankers Inc.**           4

of **the Marshall Islands** (hereinafter referred to as "Charterers"):                                                    5

| | |
|---|---|
| Description and Condition of Vessel | 1.    At the date of delivery of the vessel under **and throughout the duration of** this charter    6 |

(a)    she shall be classed: **in a classification society which is a full member of IACS.**    7

(b)    she shall be in every way fit to carry crude petroleum and/or its products;    8

(c)    she shall be tight, staunch, strong, in good order and condition, and in every way fit for the service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator and radar) in a good and efficient state;    9 10 11

(d)    her tanks, valves and pipelines shall be oil-tight;    12

(e)    ~~she shall be in every way fitted for burning~~    13

at sea - fueloil with a maximum viscosity of **380**                          Centistokes at 50 degrees Centigrade/any    14

~~commercial grade of fueloil ("ACGFO") for main propulsion~~ **and.** ~~marine diesel oil/ACGFO~~    15

~~for auxiliaries~~    16

in port - marine diesel oil/ACGFO for auxiliaries;    17

(f)    she shall comply with the regulations in force so as to enable her to pass through the Suez ~~and Panama~~ Canals by day and night without delay;    18 19

(g)    she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her to perform the charter service without delay;    20 21

(h) she shall comply with the description in **OCIMF Questionnaire 1997 for fuel oil/chemical and gas carriers** ~~Form B~~ appended hereto, provided however that if there is any conflict between the provisions of **OCIMF Questionnaire 1997 for fuel oil/chemical and gas carriers** ~~Form B~~ and any other provision, including this Clause 1, of this charter such other provision shall govern.    22 23 24

| | |
|---|---|
| Shipboard Personnel and their Duties | 2.    (a)    At the date of delivery of the vessel **and throughout the entire period of this Charter Party** under this charter    25 |

(i)    she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be trained to operate the vessel and her equipment competently and safely;    26 27 28

(ii)    all shipboard personnel shall hold valid certificates of competence in accordance with the requirements of the law of the flag state **and shall be hired and paid in accordance with ITF (or similar organization recognized by ITF) approved terms.  ITF Blue Card or similar confirmation shall be available onboard.**    29 30

(iii) all shipboard personnel shall be trained in accordance with the relevant provisions of the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978;    31 32

(iv) there shall be on board sufficient personnel with a good working knowledge of the English language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and to enable communications between the vessel and those loading the vessel or accepting discharge therefrom to be carried out quickly and efficiently.    33 34 35 36

**(v)   Crew changes will be made by overlapping and/or partial changes in conformity with oil majors' requirements.**

(b)    Owners guarantee that throughout the charter service the master shall with the vessel's officers and crew, unless otherwise ordered by Charterers,    37 38

(i)    prosecute all voyages with the utmost despatch;    39

(ii)    render all customary assistance; and    40

(iii) load and discharge cargo as rapidly as possible when required by Charterers or their agents to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the case may be) and in each case in accordance with any applicable laws of the flag state.    41 42 43

| | | |
|---|---|---|
| Duty to Maintain | 3. (i) Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel. | 44 45 46 |

(ii) If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the requirements of Clauses 1.2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so lost. — 47 48 49 50 51

Any reduction of hire under this sub-Clause (ii) shall be without prejudice to any other remedy available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded from any calculation under Clause 24. — 52 53 54

(iii) If Owners are in breach of their obligation under Clause 3(i) Charterers may so notify Owners in writing; and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(i), the vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they are exercising such due diligence. — 55 56 57 58 59

Furthermore, at any time while the vessel is off-hire under this Clause 3 Charterers have the option to terminate this charter by giving notice in writing with effect from the date on which such notice of termination is received by Owners or from any later date stated in such notice. This sub-Clause (iii) is without prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including without limitation Charterers rights under Clause 21 hereof). — 60 61 62 63 64

**Period Trading**

4. Owners agree to let and Charterers agree to hire the vessel for a period of **minimum 6 months (see Article IV B.3) of Pool Agreement)** — 65

**Limits**

commencing from the time and date of delivery of the vessel, for the purpose of carrying all lawful merchandise (subject always to Clause 28) including in particular **maximum 3 grades WVNS of Crude and/or DPP and/or Fuel Oil** — 66 67

in any part of the world, as Charterers shall direct, **always within International Navigation Limits (INL)** ~~subject to the limits of the current British Institute Warranties~~ — 68

~~and any subsequent amendments thereof~~ **but excluding Iran, North Korea, Chinese River Ports, Tolo Harbor, Turkish occupied Cyprus, Florida, Cuba, Orinoco River, Caripito, Haiti, former Yugoslavia, Israel, Alaska, Liberia, Namibia, Inner berths in Nigeria, Somolia, Ethiopia, Eritrea, Gulf of Aqaba, Cambodia and any countries or any trade prohibited by the United States, and/or the United Nations, and/or European Union, or the country of the vessel's registry. Owners warrant that the vessel can act as floating storage and perform lighterage operations. Vessel will neither trade in ice, force ice, or follow ice breakers.** Notwithstanding the foregoing, but subject to Clause 35, Charterers — 69

may order the vessel to ice-bound waters or to any part of the world outside such limits provided that Owners consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance premium required by the vessel's underwriters as a consequence of such order. — 70 71 72

Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places (which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always afloat. Notwithstanding anything contained in this or any other clause of this charter, Charterers do not warrant the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for loss or damage caused by their failure to exercise due diligence as aforesaid. **However where the vessel is sub-chartered and the sub-charter party contains representations, warranties or statements by the sub-charterers pertaining to the safety of any place, such representation, warranty or statement shall be deemed incorporated into this time charter party insofar as that voyage is concerned for the benefit of the Owners to the extent of any net recovery by the Charterers for such sub-charters.** Subject as above, the vessel shall be — 73 75 76 77 78

loaded and discharged at any places as Charterers may direct, provided that Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide. — 79 80 81

The vessel shall be delivered by Owners at **one safe** a port ~~in~~ **on dropping last outbound sea pilot (delivery area to be agreed). Owners to give Charterers 30 and 15 days approximate and 10/7/5/3/2/1 days definite notice of delivery** — 82

at Owners' option and redelivered to Owners at **one safe** a port ~~in~~ **on dropping last outbound sea pilot AG-Japan Range** — 83

at Charterers' option. — 84

**Laydays/ Cancelling**

5. The vessel shall not be delivered to Charterers before **August 15, 2015** and Charterers shall have the option of cancelling this charter if the vessel is not ready and at their disposal on or before **October 31, 2015.** — 85 86

**Owners to Provide**

6. Owners undertake to provide and to pay for all provisions, wages, and shipping and discharging fees and all other expenses of the master, officers and crew; also, except as provided in Clauses 4 and 34 hereof, for all insurance on the vessel, for all deck, cabin and engine-room stores, and for water; for all drydocking, overhaul, maintenance and repairs to the vessel; and for all fumigation expenses and de-rat certificates. Owners' — 87 88 89 90

obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall refund to Charterers any sums Charterers or their agents may have paid or been compelled to pay in respect of any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire.

**Charterers to Provide**

7. Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage and pilotage and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or distance made good and taken into account under Clause 21 or 22); and provided further that any fuel used in connection with a general average sacrifice or expenditure shall be paid for by Owners.

**Rate of Hire**

8. Subject as herein provided, Charterers shall pay for the use and hire of the vessel at the rate of *(See Article X of Pool Agreement)* per day, and pro rata for any part of a day, from the time and date of her delivery (*GMT~~local~~ time*) until the time and date of her redelivery (*GMT~~local time~~*) to Owners.

**Payment of Hire**

9. Subject to Clause 3(iii), payment of hire shall be made in immediately available funds to:

*Intermediary Bank: IRVTUS3N or ABA021000018)*

*Bank of New York Mellon, New York*
*Beneficiary Bank: DNBAUS33*
*DNB Bank ASA, New York*
*Beneficiary Account:* █████
*Beneficiary: Ridgebury V4 Investments LLC*

_____ ~~Account~~
~~in~~ ~~per calendar month in advance,~~ less:

(i) any hire paid which Charterers reasonably estimate to relate to off-hire periods, and
(ii) any amounts disbursed on Owners' behalf, any advances and commission thereon, and charges which are for Owners' account pursuant to any provision hereof, and
(iii) any amounts due or reasonably estimated to become due to Charterers under **the Charter Party including but not limited to** Clause 3(ii) or 24 hereof,

any such adjustments to be made at the due date for the next monthly payment after the facts have been ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners' account provided that Charterers have made proper and timely payment.

In default of such proper and timely payment,

(a) Owners shall notify Charterers **in writing** of such default and Charterers shall within seven days of receipt of such notice pay to Owners the amount due ~~including interest~~, failing which Owners may **upon further seven days written notice of Owners' intention to withdraw the vessel, in case of non-payment by Charterers with such seven day period,** withdraw the vessel from the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise; and

(b) Interest on any amount due but not paid on the due date shall accrue from the day after that date up to and including the day when payment is made, at a rate per annum which shall be 1% above the U.S. Prime Interest Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date. or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded semi-annually.

**Space Available to Charterers**

10. The whole reach, burthen and decks of the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed **750** tonnes at any time during the charter period.

**Overtime**

~~11. Overtime pay of the master, officers and crew in accordance with ship's articles shall be for Charterers' account when incurred, as a result of complying with the request of Charterers or their agents, for loading, discharging, heating of cargo, bunkering or tank cleaning.~~

**Instructions and Logs**

12. Charterers shall from time to time give the master all requisite instructions and sailing directions, and he shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master.

**Bills of Lading**

13. (a) The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign bills of lading as

Charterers or their agents may direct (subject always to Clauses 35(a) and 40) without prejudice to this charter.   144
Charterers hereby indemnify Owners against all consequences or liabilities that may arise   145

    (i)  from signing bills of lading in accordance with the directions of Charterers, or their agents, to   146
the extent that the terms of such bills of lading fail to conform to the requirements of this charter, or (except as   147
provided in Clause 13(b)) from the master otherwise complying with Charterers or their agents orders:   148

    (ii)  from any irregularities in papers supplied by Charterers or their agents.   149

    (b)  ***See Clause 70, 'Bills of Lading/L.O.I.'*** ~~Notwithstanding the foregoing, Owners shall not be~~   150
~~obliged to comply with any orders from~~   
~~Charterers to discharge all or part of the cargo~~   151

    ~~(i)~~  ~~at any place other than that shown on the bill of lading and/or~~   152

    ~~(ii)~~  ~~without presentation of an original bill of lading~~   153

    ~~unless they have received from Charterers both written confirmation of such orders and an~~   154
~~indemnity in a form acceptable to Owners.~~   155

**Conduct of Vessel's Personnel**

14.  If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall   156
immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without delay,   157
make a change in the appointments and Owners shall in any event communicate the result of their investigations   158
to Charterers as soon as possible.   159

**Bunkers at Delivery and Redelivery**

***15.  See Clause 64 'Bunkers on Delivery/Redelivery' and Article X of Pool Agreement.***   160
~~Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on~~   
~~redelivery (whether it occurs at the end of the charter period or on the earlier termination of this charter) accept~~   161
~~and pay for all bunkers remaining on board, at the then-current market prices at the port of delivery or redelivery,~~   162
~~as the case may be, or if such prices are not available payment shall be at the then-current market prices at the~~   163
~~nearest port at which such prices are available; provided that if delivery or redelivery does not take place in a port~~   164
~~payment shall be at the price paid at the vessel's last port of bunkering before delivery or redelivery, as the case~~   165
~~may be. Owners shall give Charterers the use and benefit of any fuel contracts they may have in force from time to~~   166
~~time, if so required by Charterers, provided suppliers agree.~~   167

**Stevedores, Pilots, Tugs**

16.  Stevedores when required shall be employed and paid by Charterers, but this shall not relieve Owners   168
from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict   169
account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents   170
against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of   171
~~pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in~~   172
the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact   173
the servants of Charterers their agents or any affiliated company); provided, however, that   174

    (i)  the foregoing indemnity shall not exceed the amount to which Owners would have been   175
entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and   176

    (ii)  Charterers shall be liable for any damage to the vessel caused by or arising out of the use of   177
stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to   178
obtain redress therefor from stevedores.   179

**Supernumeraries**

17.  Charterers may send representatives in the vessel's available accommodation upon any voyage made   180
under this charter, Owners finding provisions and all requisites as supplied to officers, except liquors. Charterers   181
paying at the rate of ***U.S. Dollars 20.00*** per day for each representative while on board the vessel.   182

**Sub-letting**

18.  Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of   183
this charter. ***When the vessel is fixed on a sub-charter party conferring greater rights on Charterers***   184
***than conferred on Owners under this time charter party, such greater rights shall be deemed to***
***be incorporated into this time charter party insofar as that voyage is concerned for the benefit of***
***the Owners to the extent of any net recovery from such sub-charterers.***

**Final Voyage**

19.  If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before   185
the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of   186
the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers   187
may deduct amounts due or reasonably expected to become due for   188

    (i)  disbursements on Owners' behalf or charges for Owners' account pursuant to any provision   189
hereof, and   190

    (ii)  bunkers on board at redelivery pursuant to Clause 15.   191

    Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made   192
good by Charterers.   193

    If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a   194
ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the   195
vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or   196
to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be.   197

**Loss of Vessel**

20.  Should the vessel be lost, this charter shall terminate and hire shall cease at noon ***GMT*** on the day of her loss;   198
should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon ***GMT*** on the day on   199
which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this   200
charter shall terminate and hire shall cease at noon ***GMT*** on the day on which she was last heard of. Any hire paid in   201
advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of   202
the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last   203
bunkering port.   204

**Off-hire**

21.  (a)  On each and every occasion that there is loss of time (whether by way of interruption in the   205
vessel's service or, from reduction in the vessel's performance, or in any other manner)   206

(i) due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the vessel; and such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's service) or cumulates to more than three hours (if resulting from partial loss of service); or 207 208 209 210 211 212

(ii) due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or 213 214

(iii) for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' representative), and such loss continues for more than three consecutive hours; or 215 216 217 218

(iv) due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or 219 220 221 222

(v) due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or neglect of Charterers); then 223 224 225

without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder or otherwise the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire. 226 227 228 229 230

(b) If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between 231 232 233

(i) the time the vessel would have required to perform the relevant service at such guaranteed speed, and 234 235

(ii) the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service). 236 237

For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24. 238 239

(c) Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a position not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby. 240 241 242 243 244 245 246 247 248 249 250

(d) If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account. 251 252 253 254

(e) Time during which the vessel is off-hire under this charter shall count as part of the charter period **or, in Charterer's option, may be added (cumulatively in full or in part, in Charterer's option) to the total hire period as provided for elsewhere in the Charter Party**. 255 256

Periodical Drydocking

22. (a) Owners have the right and obligation to drydock the vessel at regular intervals of **as required by class.** 257

On each occasion Owners shall propose to Charterers a date **to be mutually agreed** before such date, and Charterers shall offer a port for such periodical drydocking shall drydock the vessel, not less than **60 days** before such date, and Charterers shall offer a port for such periodical drydocking and shall take all reasonable steps to make the vessel available as near to such date as practicable. 258 259 260 261

Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any bill of lading or this charter. 262 263 264 265 266

(b) If a periodical drydocking is carried out in the port offered by Charterers (which must have suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to resume Charterers' service and is at the position at which she went off-hire or a position no less favourable to Charterers, whichever she first attains. However, 267 268 269 270 271

(i) provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and 272 273 274

(ii) any additional time lost in further gas-freeing to meet the standard required for hot work or entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there. 275 276

Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any calculation under Clause 24. 277 278

The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners account. 279 280

(c) If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical 281

drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to proceed to the special port until she next presents for loading in accordance with Charterers' instructions, provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any benefit they may gain in purchasing bunkers at the special port. 282 283 284 285 286 287 288

(d) Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tank-cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port. 289 290 291

**Ship Inspection**

23. Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all necessary co-operation and accommodation on board provided, however, 292 293 294 295

(i) that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsibilities to Owners or third parties for the same; and 296 297 298 299

(ii) that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents in the exercise or non-exercise of the aforesaid right. 300 301

**Detailed**

24. ***See Clause 43 'The Vessel's Description', Article XII of Pool Agreement*** (a) ~~Owners guarantee that the speed and consumption of the vessel shall be as follows:-~~ 302

**Description and Performance**

| ~~Average speed~~ | ~~Maximum average bunker consumption~~ | | 303 |
|---|---|---|---|
| ~~in knots~~ | ~~main propulsion~~ - ~~auxiliaries~~ | | 304 |
| | ~~fuel oil/diesel oil~~ | ~~fuel oil/diesel oil~~ | 305 |
| ~~Laden~~ | ~~tonnes~~ | ~~tonnes~~ | 306 |
| ~~Ballast~~ | | | 307 |

~~The foregoing bunker consumptions are for all purposes except cargo heating and tank cleaning and shall be pro-rated between the speeds shown.~~ 308 309

~~The service speed of the vessel is                knots laden and                knots in ballast and in the absence of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to steam at any speed within the range set out in the table (the "ordered speed").~~ 310 311 312 313

~~If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, and the average speed actually attained by the vessel during the currency of such order exceeds such ordered speed plus 0.5 knots (the "maximum recognised speed"), then for the purpose of calculating any increase or decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed actually attained.~~ 314 315 316 317 318

~~For the purposes of this charter the "guaranteed speed" at any time shall be the then-current ordered speed or the service speed, as the case may be~~ 319 320

~~The average speeds and bunker consumptions shall for the purposes of this Clause 24 be calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22(b) (i) would be) off-hire and also excluding "Adverse Weather Periods", being (i) any periods during which reduction of speed is necessary for safety in congested waters or in poor visibility (ii) any days, noon to noon, when winds exceed force 8 on the Beaufort Scale for more than 12 hours.~~ 321 322 323 324 325 326

(b) ~~If during any year from the date on which the vessel enters service (anniversary to anniversary) the vessel falls below or exceeds the performance guaranteed in Clause 24(a) then if such shortfall or excess results~~ 327 328 329

(i) ~~from a reduction or an increase in the average speed of the vessel, compared to the speed guaranteed in Clause 24(a), then an amount equal to the value at the hire rate of the time so lost or gained, as the case may be, shall be deducted from or added to the hire paid:~~ 330 331 332

(ii) ~~from an increase or a decrease in the total bunkers consumed, compared to the total bunkers which would have been consumed had the vessel performed as guaranteed in Clause 24(a), an amount equivalent to the value of the additional bunkers consumed or the bunkers saved, as the case may be, based on the average price paid by Charterers for the vessel's bunkers in such period, shall be deducted from or added to the hire paid:~~ 333 334 335 336

~~The addition to or deduction from hire so calculated for laden and ballast mileage respectively shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather Periods, by dividing such addition or deduction by the number of miles over which the performance has been calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather Periods, in order to establish the total addition to or deduction from hire to be made for such period.~~ 337 338 339 340 341

~~Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other remedy available to Charterers.~~ 342 343

(c) ~~Calculations under this Clause 24 shall be made for the yearly periods terminating on each successive anniversary of the date on which the vessel enters service, and for the period between the last such anniversary and the date of termination of this charter if less than a year. Claims in respect of reduction of hire arising under this Clause during the final year or part year of the charter period shall in the first instance be settled in accordance with Charterers' estimate made two months before the end of the charter period. Any necessary~~ 344 345 346 347 348

~~adjustment after this charter terminates, shall be made by payment by Owners to Charterers or by Charterers to~~ 349
~~Owners as the case may require.~~ 350
~~Payments in respect of increase of hire arising under this Clause shall be made promptly after~~ 351
~~receipt by Charterers of all the information necessary to calculate such increase.~~ 352

**Salvage**

25.  Subject to the provisions of Clause 21 hereof, all loss of time and all expenses ( excluding any damage to 353
or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in 354
successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that 355
Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of 356
services rendered under this Clause 25. 357
All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers 358
after deducting the master's, officers' and crew's share. 359

**Lien**

26.  Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts 360
due under this charter: and Charterers shall have a lien on the vessel for all monies paid in advance and not 361
earned, and for all claims for damages arising from any breach by Owners of this charter. 362

**Exceptions**

27.  (a)  The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, 363
be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the 364
master, pilots, mariners or other servants of Owners in the navigation or management of the vessel: fire, unless 365
caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, 366
bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery: provided, however, 367
that Clauses 1, 2, 3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or 368
Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage 369
or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal 370
process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or 371
restraint of princes, rulers or people. 372
(b)  The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels 373
in distress and to deviate for the purpose of saving life or property. 374
(c)  Clause 27(a) shall not apply to or affect any liability of Owners or the vessel or any other relevant 375
person in respect of 376
(i)  loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane 377
or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, 378
whether or not such works or equipment belong to Charterers, or 379
(ii)  any claim (whether brought by Charterers or any other person) arising out of any loss of or 380
damage to or in connection with cargo. All such claims shall be subject to the Hague-Visby Rules or the Hague 381
Rules **or the Hamburg Rules**, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated 382
in the relevant bill 383
of lading (whether or not such Rules were so incorporated) or, if no such bill of lading is issued, to the 384
Hague-Visby Rules **unless the Hamburg Rules compulsorily apply, in which case the Hamburg Rules
apply**.
(d)  In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not 385
apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire. 386

**Injurious
Cargoes**

28.  No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the 387
foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such 388
damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that 389
would expose the vessel to capture or seizure by rulers or governments. 390

**Grade of
Bunkers**

29.  ***See Clause 95 'Bunkers Specifications'*** ~~Charterers shall supply marine diesel oil/fuel oil with a~~ 391
~~maximum viscosity of~~     ~~Centistokes at 50~~
~~degrees Centigrade/ACGFO for main propulsion and diesel oil/ACGFO for the auxiliaries. If Owners require~~ 392
~~the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof.~~ 393
~~Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality~~ 394
~~complying with the International Marine Bunker Supply Terms and Conditions of Shell International Trading~~ 395
~~Company and with its specification for marine fuels as amended from time to time.~~ 396

**Disbursements**

30.  ***See Additional Clause 102 'Agency'*** 397
~~Should the master require advances for ordinary disbursements at any port, Charterers or their agents~~
~~shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per~~ 398
~~cent, and all such advances and commission shall be deducted from hire.~~ 399

**Laying-up**

31.  Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the 400
vessel at a safe place nominated by Charterers, in which case the hire provided for under this charter shall be 401
adjusted to reflect any net increases in expenditure ***actually*** ~~reasonably~~ incurred or any net saving which should 402
***actually*** ~~reasonably~~ be made by Owners as a result of such lay-up, Charterers may exercise the said option any number of 403
times during the charter period. 404

**Requisition**

32.  Should the vessel be requisitioned by any government, de facto or de jure, during the period of this 405
charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in 406
respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of 407
the charter period. 408

**Outbreak of War**

33.  If war or hostilities break out between any two or more of the following countries: U.S.A., U.S.S.R., 409
P.R.C., U.K., Netherlands-both Owners and Charterers shall have the right to cancel this charter. ***In the event of any*** 410
***of the following countries:  United States of America, Russia, People's Republic of China, United***

*Kingdom, or the country of the flag of the vessel are becoming engaged as actual participants in a major war, whether declared or not, against one or more of the aforementioned countries, both Owners and Charterers shall have the right to terminate this Charter Party if such war seriously affects the trading of the Vessel.*

Additional War

34.   *Should Owners grant Charterer' request to trade the vessel to a war or war-like zone for which the Owner incurs additional insurance premium, the Charterers will pay any such premium for vessel' hull and machinery, loss of hire, blocking and trapping insurance and crew and officers' war bonus and Kidnap and Ransome insurance.*   If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war,   411

Expenses

Charterers shall reimburse Owners, *again providing full supporting documentation,* for any additional **Hull and Machinery War Risk premium (H&M) net of any discounts, rebates or commissions returned to Owners** insurance ~~premia, crew bonuses and other expenses~~ which   412

are reasonably incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable and in any event before such expenses are incurred, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders.   *Upon request, Owner is to provide Charterer with a copy of the contract of insurance ("slip") for the additional cover obtained.   It is understood that Owners will endeavour to obtain competitive net additional premium rates, i.e. competitive when judged against those that are available at the time from Lloyd's of London underwriters or alternative "A" rated security ("competitive rates") and that Owners recovery from Charterers is limited to such competitive rate.*   413 / 414 / 415 / 416

War Risks

35.   (a)   The master shall not be required or bound to sign bills of lading for any place which in his or Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions or revolutions.   417 / 418 / 419

(b)   If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter (a "place of peril"), then Charterers or their agents shall be immediately notified by telex or radio messages, and Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this charter (provided such other place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.   420 / 421 / 422 / 423 / 424 / 425 / 426 / 427 / 428 / 429 / 430

(c)   The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever given by the government of the state under whose flag the vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done, such shall not be deemed a deviation.   431 / 432 / 433 / 434 / 435 / 436 / 437 / 438 / 439

If by reason of or in compliance with any such direction or recommendation the vessel does not proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners obligations under this charter so far as cargo so discharged is concerned.   440 / 441 / 442 / 443 / 444

~~Charterers shall procure that all bills of lading issued under this charter shall contain the Chamber of Shipping War Risks Clause 1952.~~   445 / 446

Both to Blame Collision Clause

36.   If the liability for any collision in which the vessel is involved while performing this charter falls to be determined in accordance with the laws of the United States of America, the following provision shall apply:   447 / 448

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier."   449 / 450 / 451 / 452 / 453 / 454 / 455

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact."   456 / 457 / 458

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be determined in accordance with the laws of the United States of America.   459 / 460 / 461

New Jason

37.   General average contributions shall be payable according to the York/Antwerp Rules, 1974 *or as later amended,* and shall   462

| Clause | | |
|---|---|---|

be adjusted in London in accordance with English law and practice but should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply: — 463, 464

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo." — 465, 466, 467, 468, 469, 470

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery." — 471, 472, 473, 474

Charterers shall procure that all bills of lading issued under this charter shall contain a provision in the foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and practice of the United States of America. — 475, 476, 477

**Clause Paramount**

38.  Charterers shall procure that all bills of lading issued pursuant to this charter shall contain the following clause: — 478, 479

"(1) Subject to sub-clause (2) hereof, this bill of lading shall be governed by, and have effect subject to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or liabilities under the "Hague-Visby Rules." — 480, 481, 482, 483, 484, 485

"(2) If there is governing legislation which applies the Hague Rules compulsorily to this bill of lading, to the exclusion of the Hague-Visby Rules, then this bill of lading shall have effect subject to the Hague Rules. Nothing herein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hague Rules." — 486, 487, 488, 489

"(3) If any term of this bill of lading is repugnant to the Hague-Visby Rules, or Hague Rules if applicable, such term shall be void to that extent but no further." — 490, 491

"(4) Nothing in this bill of lading shall be construed as in any way restricting, excluding or waiving the right of any relevant party or person to limit his liability under any available legislation and/or law." — 492, 493

**TOVALOP**

*See Clause 47 'ITOPF/P&I/OPA '90 CLAUSE* — 494

~~39.  Owners warrant that the vessel is:~~ 

~~(i)  a tanker in TOVALOP and~~ — 495

~~(ii)  properly entered in~~                                      P & I Club — 496

~~and will so remain during the currency of this charter.~~ — 497

~~When an escape or discharge of Oil occurs from the vessel and causes or threatens to cause Pollution Damage, or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage, whether or not an escape or discharge in fact subsequently occurs), then Charterers may, at their option, upon notice to Owners or master, undertake such measures as are reasonably necessary to prevent or minimise such Pollution Damage or to remove the Threat, unless Owners promptly undertake the same. Charterers shall keep Owners advised of the nature and result of any such measures taken by them and, if time permits, the nature of the measures intended to be taken by them. Any of the aforementioned measures taken by Charterers shall be deemed taken on Owners' authority as Owners' agent, and shall be at Owners' expense except to the extent that:~~ — 498, 499, 500, 501, 502, 503, 504, 505, 506

~~(1)  any such escape or discharge or Threat was caused or contributed to by Charterers, or~~ — 507

~~(2)  by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International Convention on Civil Liability for Oil Pollution Damage, Owners are or, had the said Convention applied to such escape or discharge or to the Threat, would have been exempt from liability for the same, or~~ — 508, 509, 510

~~(3)  the cost of such measures together with all other liabilities, costs and expenses of Owners arising out of or in connection with such escape or discharge or Threat exceeds one hundred and sixty United States Dollars (US $160) per ton of the vessel's Tonnage or sixteen million eight hundred thousand United States Dollars (US $16,800,000), whichever is the lesser, save and insofar as Owners shall be entitled to recover such excess under either the 1971 International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage or under CRISTAL.~~ — 511, 512, 513, 514, 515, 516

~~PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to continue said measures under the provisions of this Clause 39 and all further liability to Charterers under this Clause 39 shall thereupon cease.~~ — 517, 518, 519, 520

~~The above provisions are not in derogation of such other rights as Charterers or Owners may have under this charter or may otherwise have or acquire by law or any International Convention or TOVALOP.~~ — 521, 522

~~The term "TOVALOP" means the Tanker Owners' Voluntary Agreement Concerning Liability for Oil Pollution dated 7th January 1969, as amended from time to time, and the term "CRISTAL" means the Contract Regarding an Interim Supplement to Tanker Liability for Oil Pollution dated 14th January 1971, as amended from time to time. The terms "Oil", "Pollution Damage", and "Tonnage" shall for the purposes of this Clause 39 have the meanings ascribed to them in TOVALOP.~~ — 523, 524, 525, 526, 527

**Export Restrictions**

40.  The master shall not be required or bound to sign bills of lading for the carriage of cargo to any place to which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was produced and/or shipped. — 528, 529, 530

Charterers shall procure that all bills of lading issued under this charter shall contain the following clause: — 531, 532

"If any laws rules or regulations applied by the government of the country in which the cargo was produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo — 533, 534

to the place of discharge designated in or ordered under this bill of lading, carriers shall be entitled to 535
require cargo owners forthwith to nominate an alternative discharge place for the discharge of the 536
cargo, or such part of it as may be affected, which alternative place shall not be subject to the 537
prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and 538
discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72 539
hours after they or their agents have received from carriers notice of such prohibition, carriers shall be 540
at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place 541
on which they or the master may in their or his absolute discretion decide and which is not subject to the 542
prohibition, and such discharge shall constitute due performance of the contract contained in this bill 543
of lading so far as the cargo so discharged is concerned". 544

The foregoing provision shall apply mutatis mutandis to this charter, the references to a bill of lading 545
being deemed to be references to this charter. 546

Law and        41.   *See Clause 86 'Arbitration/Law'*   547

Litigation   (a)   This charter shall be construed and the relations between the parties determined in accordance 548
with the laws of England. 
(b)   Any dispute arising under this charter shall be decided by the English Courts to whose 549
jurisdiction the parties hereby agree. 550
(c)   Notwithstanding the foregoing, but without prejudice to any party's right to arrest or maintain 551
the arrest of any maritime property, either party may, by giving written notice of election to the other party, elect 552
to have any such dispute referred to the arbitration of a single arbitrator in London in accordance with the 553
provisions of the Arbitration Act 1950, or any statutory modification or re-enactment thereof for the time being 554
in force. 555
   (i)   A party shall lose its right to make such an election only if: 556
      (a)   it receives from the other party a written notice of dispute which - 557
         (1)   states expressly that a dispute has arisen out of this charter; 558
         (2)   specifies the nature of the dispute; and 559
         (3)   refers expressly to this clause 41(c) 560
      and 561
      (b)   it fails to give notice of election to have the dispute referred to arbitration not later than 562
30 days from the date of receipt of such notice of dispute. 563
   (ii)   The parties hereby agree that either party may - 564
      (a)   appeal to the High Court on any question of law arising out of an award; 565
      (b)   apply to the High Court for an order that the arbitrator state the reasons for his award; 566
      (c)   give notice to the arbitrator that a reasoned award is required; and 567
      (d)   apply to the High Court to determine any question of law arising in the course of the 568
reference. 569
(d)   It shall be a condition precedent to the right of any party to a stay of any legal proceedings in 570
which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that 571
party furnishes to the other party security to which that other party would have been entitled in such legal 572
proceedings in the absence of a stay. 573

Construction   42.   The side headings have been included in this charter for convenience of reference and shall in no way 574
affect the construction hereof. 575

**Seawolf Tankers Clauses 43-104 and the Seawolf Tankers Inc. Pool Agreement, as attached,
are deemed to be an integral part of this Charter Party.**

**Ridgebury ~~Kilo~~ Mike LLC**         **Heidmar Inc. as agents for
Seawolf Tankers Inc.**

_____      _____
**Robert Burke, CEO**         **Benjamin P. Ognibene, CEO**

This Charter Party is a computer generated copy of the SHELLTIME4 Charter Party form, printed using software which is
the copyright of Strategic Software Limited.

This is a precise copy of the original document which can be modified, amended or added to only by the striking out of
original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of
colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the
author.





## SEAWOLF RIDER CLAUSES

**CLAUSE 43: THE VESSEL'S DESCRIPTION – *M/T Ridgebury Purpose***

See enclosures Nos. 1 (Questionnaire 88) and 2. (Owner's detailed speed and consumption description) to this Charter.

**CLAUSE 44: ELIGIBILITY**

Owners warrant that the vessel is in all respect eligible for trading within, to and from ranges and areas specified in this charter and that she at all times shall have on board all necessary certificates, records and other documents required for such services. Further, Owners warrant that the master and crew will comply with all local regulations insofar as the safe navigation and safe operation of the vessel is concerned.

**CLAUSE 45: CHANGING REGULATIONS**

Notwithstanding any other provisions to the contrary, if during the currency of this charter any laws and/or regulations, regarding the IMO and/or ITF, are implemented which prohibit or restrict the employment of the vessel in her reasonably intended trade, Charterers shall have the option of canceling this charter, unless Owners decide to make the vessel fully compliant with such laws and/or regulations whereby the vessel again can trade freely according to the terms of this charter. Such compliance to be accomplished within 60 days after such restriction was implemented, failing which Charterers' right to cancel is reinstated. Any time lost to Charterers due to compliance works shall be off-hire.

**CLAUSE 46: VESSEL MANAGEMENT CLAUSE**

The vessel shall not change technical management, Ownership, class, or flag without Charterers' consent, which is not to be unreasonably withheld.

Failure to adhere to the above shall give the Charterers the right to cancel the charter.

**CLAUSE 47: ITOPF/P&I/OPA '90 CLAUSE**

Owners warrant that throughout the duration of this charter the vessel will be owned or demise chartered by a member of the 'International Tanker Owners Pollution Federation Limited', and entered for full cover, including maximum available pollution liability cover, in a Protection and Indemnity (P&I) Club which is a full member of the International Group of P&I clubs. At Charterers' request, Owners shall produce documentary evidence of such cover.

Charterers will fully reimburse Owners for any additional premium/surcharge charged by Owners' P&I Club on a per-voyage basis for pollution liability for trading to the United States



(and/or its exclusive economic zone as defined under the United States oil pollution act of 1990) with persistent oil.

Charterers shall likewise reimburse Owners for any additional premium being charged by Owner's P&I club or market underwriters on a per-voyage basis for oil pollution liability in any other specific area or trade with persistent oil to which the vessel may be directed or in which she may be employed.

If Owners incur such additional premium(s), Owners shall submit an invoice to Charterers detailing the additional costs with supporting documentary evidence. Charterers will not under any circumstances pay Owner's P&I club directly.

Charterers shall reimburse Owners for all reasonable expenses incurred as a result of Owners having in place compulsory contracts for or complying with regulations relative to oil pollution prevention, when these expenses are incurred on a per-voyage basis. Such expenses are to be invoiced within 60 days from discharge on the voyage incurred together with all supporting documents, failing which the right to reimbursement will be forfeited and unconditionally lost.

## CLAUSE 48:  <u>BLACKLISTING</u>

To the best of Owners knowledge, Owners warrant that at the time of delivery into this charter the vessel is not blacklisted by the Arab Boycott League and is not blacklisted by any other government.

## CLAUSE 49:  <u>CUBA TRADING</u>

Owners warrant that the vessel has not traded in Cuba during the previous 12 months prior to delivery.

## CLAUSE 50:  <u>OIL MAJOR ELIGIBILITY / SIRE REPORTS</u>

Oil majors for the purpose of this clause shall be considered to be BP, Chevron, ExxonMobil, Statoil, Shell, Total and Conoco. It is a condition that Owners comply with all provisions in this clause.

## <u>SIRE</u>

i)      Owners guarantee that a valid Sire report will be registered on the Sire system at all times throughout the currency of this Charter Party. To be a valid Sire report :-

- ~~The report must not contain any finding or observation that BP Shipping would require one of its inspectors to report as "BP high risk" including but not limited to the observations contained in the BP Shipping vessel vetting service "high risk" observations list issued 21 June 2007.~~

- No oil major shall have rejected the vessel since the inspection leading to the current valid Sire report registered on the Sire system.
- The Sire report must be no more than 4 months old if the vessel is more than 15 years old and for all other vessels, the Sire report must be no more than 6 months old



- The vessel's operator listed in the Sire report must not have changed.
- None of the certification listed in Section 2 of the Sire report shall be/have become out of date.

## Oil Major Eligibility

ii)   Owners further guarantee that:

    a.   The vessel shall be eligible for the business, at the date of delivery under this Charter Party of at least three oil majors at all times ("delivery eligibility"). Subsequent to delivery, Owners warrant that they will maintain the minimum level of vetting approvals as per the Seawolf Pool Agreement. This does not apply to newbuildings.

    b.   Owners shall exercise best endeavors to obtain as soon as possible thereafter eligibility to the remaining oil majors and upon Charterers request also to any other parties at Charterers cost.

    c.   If Owners become aware that the vessel is ineligible to any oil major, they must advise Charterers at once and must reinstate acceptability within 60 (sixty) days from such occurrence.

    d.   The vessel shall at all times comply with oil major crew matrix requirements.

iii)  In the event of any disagreement between Owners and Charterers as to whether the vessel is eligible, Owners to provide Charterers on their request with all correspondence exchanged with the approving party.

iv)   The vessel shall be deemed not to be eligible if the approving party needs to carry out its own physical inspection of the vessel. Advice by the approving party that it will refer to the registered valid Sire report is evidence that such a physical inspection is not required but is not evidence that the vessel is eligible to the approving party.

v)    Owners to advise Charterers in writing about any known oil major rejections/incidents/ accidents/casualties/structural problems/fleet holds or any other issues of any kind whatsoever which may affect eligibility. Failure to do so would be a material breach of charter.

vi)   If, in order to obtain such eligibility, an oil major needs to carry out an inspection of the vessel, the cost of such an inspection plus any time lost in order to effect and as a result of that inspection shall be for Owners account.

vii)  If Owners fail to comply with any of their obligations arising in this clause, then Charterers will have the option to:

- Place the vessel off-hire until such time as Owners are again compliant with their obligations, and/or
- At any time whilst Owners are in breach of their obligations, to cancel the charter, without penalty by giving Owners a minimum (sixty) 60 days redelivery notice with redelivery within the Charter Party trading range.



- Owners to provide a copy of the latest Sire report to Charterers.

## CLAUSE 51: CAST IRON

Owners warrant that all raiser valves and fittings, outboard of the last fixed rigid support to the ship's deck, that are used in the transfer of cargo or ballast, are made of steel or nodular iron and that only steel reducer or spacer will be used between the ship's valve and the loading arm. The fixed rigid support must be designed to prevent both lateral and vertical movement of the transfer manifold.

## CLAUSE 52: OCIMF COMPLIANCE

Owners warrant that the vessel complies with all OCIMF guidelines for oil tankers.

Specifically, but without limitation to the foregoing, Owners confirm that:
a) The vessel does and will throughout this Charter Party comply with OCIMF "standards for equipment employed in the mooring of ships at single point moorings" (SBM) and is equipped with an OCIMF approved tongue type chain stopper sized for 76 mm chain and a minimum SWL of 200 mt.
b) The vessel has H2s measuring equipment onboard in accordance with OCIMF guidelines.
c) The vessel's IGS system is equipped with "wet" type deck seal.

## CLAUSE 53: CLOSED LOADING

Owners warrant that the ship is equipped with and will maintain a functional closed loading system and has calibrated vapor locks.

## CLAUSE 54: PUMPING

Owners guarantee that the vessel can discharge the entire cargo within 24 (twenty-four) hours or pro-rata for part cargo(es), or alternatively maintain an average of minimum 100 psi at ship's rail for the entire discharge operation provided this is permitted by shore.

Should the vessel fail to meet the load rate warranty, Charterers are entitled to deduct from hire all time used in excess of the warranty. Should the vessel fail to meet both of the discharge warranties, Charterers are entitled to deduct from hire an amount corresponding to the pumping time in excess of 24 hours.

Discharge terminal shall have the right to gauge line pressure. All pumping logs must be noted by the vessel and countersigned by receivers and/or cargo inspector and/or agents, if possible. In the event of any restriction imposed by receiving terminal (restricting/slowing discharge), notice of protest must be issued by the master to receivers. Should Charterers require the vessel to perform crude oil washing concurrently with cargo discharge operations, the vessel is to be allowed an additional 12 hours for discharging a full cargo, or pro rata for part cargoes.



Should it become necessary to withdraw the vessel from berth, because of Owner's failure to maintain the required pumping rate, all time lost, expenses incurred and any consequential losses suffered by Charterers to be for Owner's account.

## CLAUSE 55: EXXON DRUG AND ALCOHOL (AS AMENDED 20TH JUNE, 1990)

Owners warrant that they have a policy on Drug and Alcohol Abuse ("policy") applicable to the vessel which meets or exceeds the standards in the Oil Companies International Marine Forum ("OCIMF guidelines").

Owners further warrant that this policy will remain in effect during the term of this charter, and that Owners shall exercise due diligence to ensure that the policy is complied with.

## CLAUSE 56: ENGLISH LANGUAGE

Master, Chief Officer, Chief Engineer and all Crew members involved with cargo operations to be able to communicate with Charterers, Agents and Port Authorities in English. Any delays or other consequences of inability of said officers to communicate in English to be for Owners' account, provided terminal operators speak English as well.

## CLAUSE 57: FINANCIAL RESPONSIBILITY

Without in any way diminishing the requirements of effect of any other clause of this charter, Owners shall ensure that at the time of delivery and during the entire charter period the vessel has onboard certificates(s) or other evidence(s) of financial responsibility and/or other similar document(s) ("documents") as required by any known laws and/or regulations in the port(s) and/or place(s) to which the vessel may lawfully be ordered hereunder.

Owners are to pay for the annual/basic premium/fee for obtaining and maintaining such documents, but additional premiums/fees levied on the basis of individual voyages will be reimbursed by Charterers based on Owners' invoices with pertinent support documentation. Such expenses are to be invoiced within 60 days from discharge on the voyage incurred together with all supporting documents, failing which the right to reimbursement will be forfeited and unconditionally lost.

## CLAUSE 58: SATCOM

Owners guarantee that the vessel is fitted with operational telex/fax equipment and e-mail.

## CLAUSE 59: DRAWINGS

Copies of the Cargo Capacity Plan, General Arrangement Plan, Pumping Diagram, Loading Scale, Bow Chain Stopper Diagram, Forecastle Mooring Diagram and Suez Certificate will be furnished to Charterers before delivery.



## CLAUSE 60:  RE-MEASURING

Charterers have the option to re-measure the vessel for the purpose of satisfying certain port/terminal regulations.  All cost and time for re-measuring to be for Charterers' account.


## CLAUSE 61:  GUIDELINES TO MASTER

The vessel's officers are to carefully review and follow Charterers' "Guidelines to Master" as provided to the vessel and updated as appropriate during the charter period (subject to review of the Owner).


## CLAUSE 62:  VACCINATION

Owners agree to arrange at their expenses that the Master, Officers and Crew of the vessel hold valid vaccination certificates.


## CLAUSE 63:  WATCHMEN

Gangway Watchmen and Fire Watchmen to be for Owners' account, unless compulsory, in which case, cost to be for Charterers' account.


## CLAUSE 64:  BUNKERS ON DELIVERY/REDELIVERY

Bunkers on delivery/redelivery to be about same quantities, but always sufficient to reach nearest bunkering port.  Bunkers on delivery/redelivery to be paid to owners/Charterer based on last actual, duly documented, purchase price (including barging costs, if any).  Bunkers to be purchased by the Charterer upon delivery.


## CLAUSE 65:  TVEL

Time lost if beyond six (6) hours (which shall include time before the vessel can tender a valid NOR due to restrictions imposed by the local authorities before inspection) in order to obtain or maintain a valid TVEL/COC Certificate shall be for Owners' account.


## CLAUSE 66:  HEATING

~~Vessel to load cargo up to and including 60 degrees Celsius. Vessel to be able, throughout the time charter period, to maintain the cargo temperature up to a maximum 55 degrees Celsius and if loaded below, vessel shall be able to heat cargo up to a maximum of 55 degrees Celsius if so required.~~


## CLAUSE 67: CARGO RETENTION

In the event that any cargo remains onboard upon completion of discharge, Charterers shall have the right to deduct from hire an amount equal to the F.O.B. port of loading value of such cargo plus freight due with respect thereto, provided that the volume of such cargo is liquid, pumpable and reachable by the vessel's normal discharge equipment as determined by an independent surveyor. Any action or lack of action in accordance with this provision shall be without prejudice to any right or obligations of the parties. This clause only to apply if a cargo claim is received from a sub-Charterer.

## CLAUSE 68: EQUIPMENT

~~Subject to Owners' approval, which shall not be unreasonably withheld, Charterers shall be at liberty to fit any additional pumps and/or equipment for cleaning, loading and discharging or heating cargo that they may require beyond what is on board at the commencement of this charter, and to make the necessary connection(s) with steam or water pipes. Such work to be done at Charterers' expense, and pumps and/or gear so fitted to be considered Charterers' property. Charterers shall at their option remove it at their expense and in their time during or at expiry of the charter. Owners agree to exercise due diligence to protect Charterers' equipment and/or gear from damage while in vessel's/crew's custody.~~

## CLAUSE 69: SHIP-TO-SHIP TRANSFER / LIGHTERAGE

Charterers have the option to load and/or discharge and/or lighten the vessel via ship-to-ship transfer in accordance with the procedure set out in OCIMF's "Ship-to-Ship Transfer Guide", always to the Master's satisfaction.

If lightering is required, this is subject to Master's approval. Any extra costs which may be placed on the vessel and/or cargo as a result of such lightering shall be for Charterers' account. Such expenses are to be invoiced within 60 days from discharge on the voyage incurred together with all supporting documents, failing which the right to reimbursement will be forfeited and unconditionally lost.

Charterers are to provide and pay for adequate fenders, moorings, hoses and equipment necessary to perform the lightering, all of which shall be to the master's satisfaction. Lightering shall always be carried out in conformity with the provisions of the "OCIMF Ship-to-Ship Transfer Guide".

Charterers shall notify Owners of such lightering operations and give Owners sufficient notice to arrange additional insurance cover, where applicable.

## CLAUSE 70: BILLS OF LADING / L.O.I.

Should Bills of Lading not arrive at discharge port(s) in time, then Owners agree to release the entire cargo without presentation of the original Bills of Lading against issuance by sub-Charterers to Owners of a Letter of Indemnity in Owner's P&I Club or similar oil major wording.



Charterers to provide this Letter of Indemnity from sub-Charterers to Owners. Issuance may be arranged by means of proper invocation. Such Letter of Indemnity shall remain in force until 1/3 original Bills of Lading endorsed by cargo receivers have been received by Owners.

In every case where there is a change of discharge port, sub-Charterers will similarly provide Owners with a Letter of Indemnity issued in Owner's P&I club or similar oil major wording.

Owners agree to accept sub-Charterers' Letter of Indemnity as sole security when sub-Charterers are oil companies or traders of such standard as BP-Amoco, Shell, Exxon-Mobil, ~~Texaco~~, Chevron, ~~El Paso~~, Total-~~fina-elf~~, AGIP, Vitol, ~~Marc Rich~~, Glencore, ~~Alpine~~, Adam Maritime, AOT, ~~Cargill~~, Itochu, MSK, Koch, IOC, ~~Scanports, Emerald, Tosco, DEA, Veba, Rio Energy, Greenergy~~, Valero, ~~Ultramar and Kodiak~~, but is not limited to the companies listed. In the event sub-Charterers are of a lesser standard and reputation than those listed then such other sub-Charterers shall provide Letter of Indemnities as per Owners' P&I club wording countersigned by first class bank.

## CLAUSE 71: SEA TERMINAL

When calling at a sea terminal, Owners warrant that the vessel will maintain her engines in readiness, and will be loaded and discharged in such manner that she at any stage of loading and/or discharging operations is able, if necessary, for any reason, to immediately shut down cargo operations, and promptly disconnect hoses and mooring lines and proceed to another anchorage or put to sea.

## CLAUSE 72: FLORIDA STRAITS TRANSIT

***No Florida Straights transit in laden condition.***

~~The vessel, when transiting the Florida straits from Key Biscayne south to the Dry Tortugas, shall maintain a distance of not less than 10 miles off the outer navigational aids marking the reefs off the Florida coast.~~

## CLAUSE 73: HOSES

If requested by terminal, the vessel's crew will connect/disconnect hoses without charge to Charterers for any time or overtime involved.

## CLAUSE 74: ADHERENCE TO VOYAGE INSTRUCTIONS

Owners shall be responsible for the due and full performance of any voyage or other operational instructions given by Charterers. Owners shall indemnify Charterers for any error or omission in carrying out any such voyage or operational instruction and for any other failure to diligently and fully to carry out all Charterers' lawful instructions given under this charter.



## CLAUSE 75: <u>WEATHER ROUTING SERVICE</u>

Charterers shall have the option to have the vessel monitored by ocean routes or similar routing service. All expenses shall be paid by Charterers who will inform the Master from time to time if/when using such a service in order to maximize the vessel's performance. The Master is to follow routing suggestions concerning navigation. The Master, at his reasonable discretion, may not follow suggested route, in which case he is to describe in details in the log book the reason for departing from them.

## CLAUSE 76: <u>IN-TRANSIT LOSS</u>

In addition to any other right Charterers may have, Owners in any event to be responsible for the full amount of any in-transit loss if in-transit loss of cargo exceeds 0.3 % and Charterers shall have the right to deduct from hire an amount equal to the FOB port of loading cost of such missing cargo plus its pro rata cost of freight and insurance. In-transit loss is defined as the difference between gross standard vessel volumes after loading at the load port and the gross standard volume upon arrival, before unloading at the discharge port.

## CLAUSE 77: ~~CARGO REINSURANCE ASSOCIATION~~

~~Vessels over 15 years of age are to be in possession of Cargo Reinsurance Association (CRA) approval throughout charter-party duration and proof of same to be submitted to Charterers prior to confirmation of fixture.~~

~~In case the necessity for CRA approval develops in the course of the charter then Owners to obtain and provide same to Charterers in timely fashion, failing which all consequential loss(es) and all time and costs to be for Owners' account.~~

## CLAUSE 78: <u>ARREST/DETENTION</u>

Should the vessel be seized or detained by any authority or arrested or attached at the suit of any party having or purporting to have a claim against the vessel and/or her present or previous Owners, the vessel shall go off hire for any period during which the vessel is not at Charterers' disposal and all extra expenses shall be for Owners' account, unless such seizure or detention is occasioned by any personal act or omission or default of Charterers or their agents, or by reason of the cargo carried under this charter.

If Owners fail to arrange for the immediate release of the vessel from such arrest/detention, Charterers shall have the option to provide the required security or, in the case of undisputed claim(s), settle such claim(s) directly with claimant(s) to obtain the release of the vessel. In such case, the ship will go back on hire upon her release, but payment of hire shall be suspended until Owners have fully refunded any amount thus provided/paid by Charterers, ~~plus 10% interest p.a. Or part thereof~~. Owners specifically agree that any amount provided by Charterers as security shall give Charterers a contractual right to arrest the ship and/or any other asset of the Owners if refund is not made within a reasonable time.



If the vessel is repeatedly arrested, Charterers shall have the option to cancel this Charter Party without any penalty.

In the event of the vessel being subject to boycott by ITF or any other body, being delayed or rendered in-operative by strikes, labor stoppages or any other difficulties arising from the vessel's flag, Ownership, crew or terms of employment and payment of the same Ownership, operation or control, such time lost is to be considered as off-hire and all consequences of such actions to be for Owners' account.

Any delay to the vessel caused by flag or nationality of crew shall count as off-hire and extra expenses and consequences whatsoever incurred by Charterers attributable to flag or nationality of crew will be for Owners' account.

## CLAUSE 79:  OFF-HIRE CONSUMPTION

All bunkers used by the vessel during off-hire shall be for Owner's account.

## CLAUSE 80:  ACCUMULATED OFF-HIRE PERIODS

If the vessel has been off-hire for any reason for 10 accumulated days, other than dry dock, Charterers shall have the option to cancel this charter.  Charterers shall have the option to add all or part of off-hire time to the charter period.  Charterers to declare their option latest 30 (thirty) days prior to the end of the period.

## CLAUSE 81:  SMUGGLING

Owners confirm that they have signed the US Customs Carrier Initiative Agreement.

Any delays, expenses and/or fines incurred on the account of smuggling to be for Owners' account if caused by the Master, Officers, Crew or Owners' servants, and any consequential losses flowing from such incidents also to be for Owners' account.

## CLAUSE 82:  CHARTERERS' USE OF THE VESSEL DURING OFF-HIRE

Should there occur an event which puts the vessel off-hire, Charterers shall nevertheless be allowed to perform bunkering or other operations which do not interfere with Owners' use of the vessel, subject to Owners' prior approval, and the vessel remains off-hire as if Charterers' operations had not been performed.  Owners also have the right to perform technical maintenance during commercial downtime, provided Charterers approve in advance.

## CLAUSE 83:  PERFORMANCE

It is agreed with reference to Clause 24 and other provisions regarding the vessel's performance that no claim can be made by Owners for compensation/bonus in case the vessel performs better than described.



## CLAUSE 84: <u>MEDIA</u>

Charterers have entered into a contract for media management service with Maritime Technical International (MTI Network) to coordinate any media responses, should same be necessary, resulting from a maritime incident to the vessel.  Owners agree that details of the vessel and Owners/management Company will be provided to MTI network to ensure that it is able to respond quickly and effectively to the media should the vessel be involved in an incident of public interest.  Should Owners be using a media consultant other than MTI Network, then MTI Network will coordinate with Owners' consultant as well.


## CLAUSE 85: <u>WEBSITE</u>

Details of the vessel can be accessed via website <u>www.heidmar.com</u>.  In conjunction with the website, the vessel's position will be accessible by a sub-Charterer, but only with a unique password supplied by Charterers in order to be able to see the location of the vessel while on that voyage.  Owners agree, at no cost to Owners, to allow the vessel to be polled at regular intervals in order to obtain position, heading, and speed.  The only people who will have access to the vessel's position via the website are Owners (at any time), Charterers, and sub-Charterers.  No additional efforts are required by vessel personnel.


## CLAUSE 86: <u>ARBITRATION/LAW</u>

This Charter Party is governed by English law and all disputes arising under or in connection with it shall be referred to arbitration in London. The arbitration shall be conducted in accordance with one of the following LMAA procedures:

   a)  Where the amount claimed by the claimant is less than USD 100,000, excluding interest, the reference shall be to a sole arbitrator and the arbitration shall be conducted in accordance with the LMAA FALCA rules;

   b)  Where the amount claimed by the claimant is less than USD 30,000, excluding interest, the reference shall be to a sole arbitrator and the arbitration shall be conducted in accordance with the LMAA small claims procedure;

   c)  In any case where the LMAA procedures referred to above do not apply, the reference shall be to three arbitrators (one to be appointed by each of the parties and the third by the arbitrators so chosen) in accordance with the LMAA terms in force at the relevant time.


## CLAUSE 87: <u>P&C</u>

Fixture to be kept strictly private and confidential.



**CLAUSE 88: Q88.COM**

Prior to delivery, Owners undertake to provide a completed VPQ and subscribe to the services provided by "Q88.com", an internet facilitator of VPQ data processing. Further, Owners undertake to maintain the subscription to "Q88.com" for the period of this Charter Party and guarantees that the information supplied to Q88.com is at all times updated and correct. Owners agree to be liable for any and all consequences suffered by Charterer as a result of any breach of the undertakings herein prescribed.

**CLAUSE 89: SLOW SPEED/SPEED UP**

Charterers shall have the right to order the vessel to adjust her speed up or down for her ordinary service speed, but always consistent with safe operation of the vessel and her machinery.

**CLAUSE 90: COMINGLING**

Charterers shall have the option to comingle grades of cargo onboard, provided such comingling is within the technical capability of the vessel, is not harmful to the vessel or, her crew and that the Master considers it safe to do so.

On each occasion Charterers instruct the vessel to comingle cargoes/grades they shall provide Owners with a Letter of Indemnity in a form acceptable to Owners for any consequences thereof.

**CLAUSE 91: PIRACY**

(a)  If the vessel proceeds to or through an area exposed to potential risk of piracy the Owners shall have the liberty:

(i)     to take reasonable preventive measures to protect the vessel, her crew and cargo including but not limited to taking a reasonable alternative route, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel or equipment on or about the vessel,

(ii)    to comply with the orders, directions or recommendations of any underwriters who have the authority to give the same under the  terms of the insurance;

(iii)   to comply with all orders, directions, recommendations or advice given by the government of the nation under whose flag the vessel sails, or other government to whose laws the Owners are subject, or any other government, body or group, including military authorities, whatsoever acting with the power to compel compliance with their orders or directions;

(iv)   to comply with the terms of any resolution of the security council of the united nations, the effective orders of any other supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;



(b) Costs

(i)   if the vessel proceeds to or through an area where due to risk of piracy additional costs will be incurred including but not limited to additional insurance, additional personnel and preventative measures to avoid piracy attacks, such costs shall be borne by the Charterer provided that they are reasonable and totally at their discretion.

Any time lost waiting for convoys, following recommended routing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the vessel shall remain on hire;

(ii)   if the Owners become liable under the terms of employment, ITF or similar agreements, to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the duly documented actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers.

(iii)   if the underwriters of the Owners' insurances should require payment of additional premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such underwriters as being subject to additional premiums because of piracy risks, then the duly documented actual additional premiums and/or calls paid shall be reimbursed by the Charterers provided the amount of such additional premium has been advised to Charterers in advance.

(c)  If the vessel is attacked or seized by pirates any time lost shall be for the account of the Charterers and the vessel shall remain on hire up to a maximum of ~~90~~ **200** days.  If the vessel is seized the Owners shall keep the Charterers closely informed of the efforts made to have the vessel released.

(d)  If in compliance with this clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.


**CLAUSE 92:**  **STRIPPING TIME**

Whenever possible, vessel will follow the practice of internal stripping during bulk discharge and concurrent to the discharging operation. In any case, stripping time will be limited to maximum 3 hours per voyage over and above bulk discharge time.


**CLAUSE 93:  UN/US SANCTION CLAUSE:**

~~During the period of the charter, if UN/US sanctions and / or trading limitations are imposed and Owners and/or Charterers find it impossible to trade the vessel then upon immediate notice to the other party the parties will discuss in good faith the  best possible alternative for the vessel. If not amicable compromise can be reached then upon 30 day notice either party will be within their rights to terminate cp without any legal or any other recourse to the other party.~~



**CLAUSE 94: <u>DRYDOCK CLAUSE</u>**

~~Clause 22 of the Shelltime 4 form shall be deleted in its entirety and replaced with the following:~~

~~"no dry-docking shall be undertaken by the Owners during the period of this Charter Party unless for emergency purposes or unless mutually agreed, in which case Owners are to give Charterers at least three (3) months' notice together with the reasons for dry-docking and the estimated time of completion of dry-docking. In all cases of dry-docking, the vessel shall be off-hire from the time of dropping outward sea pilot from the previous port, or from completion of discharge if the previous port is also the dry-docking port, (the "off-hire position") until the vessel resumes her service from a position no less favorable to Charterers than the off-hire position.~~

**CLAUSE 95: <u>BUNKER SPECIFICATIONS</u>**

The vessel will be supplied with IFO 380 CST ISO 8217:2005 with notation that Charterers will endeavour to purchase ISO 8217:2010 if and when available, provided cost competitive with ISO 8217:2005.

**CLAUSE 96: <u>COFR</u>**

The cost of arranging COFR shall be for Owners account. COFR costs per port call shall be for Charterers account, additional P&I club costs for trading to USA or its dependant territories levied on a voyage basis to be for Charterers' account.

**CLAUSE 97: <u>EU BUNKER SPECIFICATION COMPLIANCE</u>**

The vessel is EU compliant regarding the burning of LSFO in the restricted areas.

**CLAUSE 98: <u>TAXES/DUES</u>**

Any taxes and /or dues on cargo and sub freight shall be for Charterers account.

**CLAUSE 99: <u>KIDNAPPING &RANSOM (K&R) COVER</u>**

Charterers warrant that at the time of the charter, they have a K&R program in place for USD 8,000,000.

**CLAUSE 100: <u>BDN CLAUSE</u>**

In view of increasing incidences of bunker suppliers,
Claiming lien of cargo / vessel following clause will be inserted by
Master in bdn.



Quote:
"The bunkers to be stemmed are solely for the account of Charterers, who do not, nor are they entitled to, obtain such bunkers against the credit of the vessel or of the Owners. Receipt of such bunkers does not amount to an implied or tacit consent by the Owner, Master or Crew to bind the vessel in any manner for such bunkers."
Unquote


**CLAUSE 101:** <u>**BIMCO ISPS CLAUSE**</u>

**(a)(i)**   from the date of coming into force of the international code for the security of ships and of port facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the vessel and "the company". Upon request the Owners shall provide a copy of the relevant International ship security certificate (or the interim international ship security certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

**(ii)**   except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the company" to comply with the requirements of the ISPS Code or this clause shall be for the Owners' account.

**(b)(i)**   The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners."

**(ii)**   Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers' account.

**(c)**   Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the ship security plan shall be for the Owners' account.

**(d)**   If either party makes any payment which is for the other party's account according to this clause, the other party shall indemnify the paying party.



**CLAUSE 102: <u>AGENCY</u>**

Charterers to appoint vessel's ship agents at every port of call. Charterers are responsible for paying all port charges relating directly to the loading, discharging and bunkering operations of the vessel. All other costs in relation to, amongst others, vessel's husbandry costs, including but not limited to stores, provisions, crew changes, cash to master, medical expenses, spare parts, lubricating oil etc., are for Owners' account and are to be settled by them directly with ship agents.

Any time during which the vessel is detained, or delayed, as a result of failure by Owners to place ship agents in necessary funds, is considered as off-hire.

**CLAUSE 103: <u>COW</u>**

Owners undertake that the vessel is equipped with a fully functional crude oil washing system and that the officers and crew are properly qualified by way of certification for the experienced operation of such system.

The master shall arrange for crude oil washing of cargo tankers at discharge port(s) or place(s) in accordance with Charterers and IMO requirements. A period of 8 hours or pro rata on the basis of tanks washed against the number of total cargo tanks in addition to the period specified in the pumping clause shall be allowed for crude oil washing and any additional time taken therefore shall be considered off hire.

Any period of time carried out COW and discharge operation simultaneously is not to be counted as time used for COW operation.

**CLAUSE 104: <u>STORAGE</u>**

If the vessel to be used as floating storage, Owners will have the option of cleaning the underwater hull subject to Charterers approval. All time and costs associated with underwater cleaning to be for Charterers account.



ENCLOSURE 1: Q88 – *to be updated*

**INTERTANKO'S STANDARD TANKER CHARTERING QUESTIONNAIRE 88 (Q88)**    **Version 3**

| 1. | VESSEL DESCRIPTION | |
|---|---|---|
| 1.1 | Date updated: | August 7, 2015 |
| 1.2 | Vessel's name: | Ridgebury Purpose |
| 1.3 | IMO number: | 9180164 |
| 1.4 | Vessel's previous name(s) and date(s) of change: | British Purpose |
| 1.5 | Date delivered: | Aug 14, 2000 |
| 1.6 | Builder (where built): | Samsung Heavy Industries Co Ltd |
| 1.7 | Flag: | Isle of Man |
| 1.8 | Port of Registry: | Douglas |
| 1.9 | Call sign: | ZQCP3 |
| 1.10 | Vessel's satcom phone number: | +773155911 |
| | Vessel's fax number: | +783158986 |
| | Vessel's telex number: | 423501710 |
| | Vessel's email address: | master.purpose@bpsfleet.com |
| 1.11 | Type of vessel: | Oil Tanker |
| 1.12 | Type of hull: | Double Hull |

| Classification | | |
|---|---|---|
| 1.13 | Classification society: | Lloyds Register |
| 1.14 | Class notation: | 100A1 Double Hull Oil Tanker, ESP, ShipRight (SDA, FDA, CM), IWS, LI, SPM, LMC IGS, UMS, CCS, NAV1, IBS |
| 1.15 | If Classification society changed, name of previous society: | N/A |
| 1.16 | If Classification society changed, date of change: | N/A |
| 1.17 | IMO type, if applicable: | N/A |
| 1.18 | Does the vessel have ice class? If yes, state what level: | No , NA |
| 1.19 | Date / place of last dry-dock: | Dec 21, 2013   Singapore (Wet Dock) |
| 1.20 | Date next dry dock due | Aug 13, 2015 |
| 1.21 | Date of last special survey / next survey due: | Aug 13, 2010     Aug 13, 2015 |
| 1.22 | Date of last annual survey: | Aug 05, 2014 |
| 1.23 | If ship has Condition Assessment Program (CAP), what is the latest overall rating: | |
| 1.24 | Does the vessel have a statement of compliance issued under the provisions of the Condition Assessment Scheme (CAS): If yes, what is the expiry date? | N/A |

| Dimensions | | | |
|---|---|---|---|
| 1.25 | Length Over All (LOA): | | 334.07 m |
| 1.26 | Length Between Perpendiculars (LBP): | | 320.00 m |
| 1.27 | Extreme breadth (Beam): | | 58.04 m |
| 1.28 | Moulded depth: | | 31.25 m |
| 1.29 | Keel to Masthead (KTM) / KTM in collapsed condition (if applicable): | 67.80 m | m |
| 1.30 | Bow to Center Manifold (BCM) / Stern to Center Manifold (SCM): | 170.10 m | 164.00 m |



| 1.31 Distance bridge front to center of manifold: | | | | 110.60 m |
|---|---|---|---|---|

| 1.32 Parallel body distances: | Lightship | Normal Ballast | Summer Dwt |
|---|---|---|---|
| Forward to mid-point manifold: | 84.00 m | 94.50 m | 94.50 m |
| Aft to mid-point manifold: | 27.00 m | 57.50 m | 79.40 m |
| Parallel body length: | 111 m | 152 m | 173.9 m |

| 1.33 FWA at summer draft / TPC immersion at summer draft: | 504 mm | 173 MT |
|---|---|---|

| 1.34 What is the max height of mast above waterline (air draft) | Full Mast | Collapsed Mast |
|---|---|---|
| Lightship: | 64.31 m | 0 m |
| Normal ballast: | 55.61 m | 0 m |
| At loaded summer deadweight: | 45.276 m | 0 m |

## Tonnages

| 1.35 Net Tonnage: | 105889 | |
|---|---|---|
| 1.36 Gross Tonnage / Reduced Gross Tonnage (if applicable): | 160216 | 126598 |
| 1.37 Suez Canal Tonnage - Gross (SCGT) / Net (SCNT): | 162896 | 151168.38 |
| 1.38 Panama Canal Net Tonnage (PCNT): | | |

## Loadline Information

| 1.39 Loadline | Freeboard | Draft | Deadweight | Displacement |
|---|---|---|---|---|
| Summer: | 6.962 m | 22.524 m | 306307.6 MT | 348817.6 MT |
| Winter: | 7.431 m | 22.055 m | 298296.7 MT | 340717 MT |
| Tropical: | 6.493 m | 22.993 m | 314535.5 MT | 356955.8 MT |
| Lightship: | 26.99 m | 3.49 m | | 42510.20 MT |
| Normal Ballast Condition: | 18.64 m | 10.84 m | 111626.20 MT | 154136.40 MT |

| 1.40 Does vessel have multiple SDWT? | Yes |
|---|---|
| 1.41 If yes, what is the maximum assigned deadweight? | 306307.40 MT |

## Ownership and Operation

1.42 Registered owner - Full style:
Ridgebury Mike LLC
Trust Company Complex
Ajeltake Island
Ajeltake Road
Majuro, Marshall Islands MH 96960
Tel: +1 203 304 6130
Fax: N/A
Telex: N/A
Email: ops@ridgeburytankers.com

1.43 Technical operator - Full style:
Bernhard Schulte Shipmanagement
(Cyprus) Limited Hanseatic House,111 Spyrou
Araouzou Str, PO Box 50127, CY 3601, Limassol
, Cyprus
Tel: +357-25846400
Fax: +357-25745245
Telex: NA
Email: cy-sdc-vettings@bs-shipmanagement.com
Web: www.bs-shipmanagement.com
Company IMO#: 0025123

1.44 Commercial operator - Full style:
Heidmar Inc.
20 Glover Avenue, Norwalk, CT 06850
Tel: +1-203-662-2600
Fax: +1-203-662-6610
Telex: N/A



Email: Bulletin@heidmar.com

1.45 Disponent owner - Full style:

Seawolf Tankers Inc.
c/o Heidmar Inc.
20 Glover Avenue, Norwalk, CT 06850
Tel: +1-203-662-2660
Fax: +1-203-662-2782
Telex: N/A
Email: Bulletin@heidmar.com

| 2. | CERTIFICATION | Issued | Last Annual or Intermediate | Expires |
|---|---|---|---|---|
| 2.1 | Safety Equipment Certificate: | Aug 15, 2012 | Aug 28, 2014 | Aug 13, 2015 |
| 2.2 | Safety Radio Certificate: | Sep 28, 2010 | Aug 05, 2014 | Aug 13, 2015 |
| 2.3 | Safety Construction Certificate: | Sep 28, 2010 | Aug 05, 2014 | Aug 13, 2015 |
| 2.4 | Loadline Certificate: | Aug 13, 2010 | Dec 18, 2013 | Aug 13, 2015 |
| 2.5 | International Oil Pollution Prevention Certificate (IOPPC): | Sep 28, 2014 | Aug 05, 2014 | Aug 13, 2015 |
| 2.6 | Safety Management Certificate (SMC): | Aug 13, 2010 | Mar 27, 2014 | Jul 24, 2015 |
| 2.7 | Document of Compliance (DOC): | Jan 20, 2011 | Feb 05, 2014 | Feb 12, 2015 |
| 2.8 | USCG (specify: COC, LOC or COI): | May 16, 2011 | Dec 18, 2012 | May 16, 2013 |
| 2.9 | Civil Liability Convention Certificate (CLC): | Feb 20, 2015 | | Feb 20, 2015 |
| 2.10 | Civil Liability for Bunker Oil Pollution Damage Convention Certificate (CLBC): | Feb 20, 2015 | | Feb 20, 2016 |
| 2.11 | U.S. Certificate of Financial Responsibility (COFR): | Jan 08, 2012 | | Aug 01, 2015 |
| 2.12 | Certificate of Fitness (Chemicals): | Not Applicable | | Not Applicable |
| 2.13 | Certificate of Fitness (Gas): | Not Applicable | | Not Applicable |
| 2.14 | Certificate of Class: | Aug 14, 2010 | Aug 05, 2014 | Aug 13, 2015 |
| 2.15 | International Ship Security Certificate (ISSC): | Jul 21, 2010 | Mar 27, 2013 | Jul 24, 2015 |
| 2.16 | International Sewage Pollution Prevention Certificate (ISPPC) | Aug 15, 2012 | | Aug 13, 2015 |
| 2.17 | International Air Pollution Prevention Certificate (IAPP): | Aug 15, 2012 | Sep 28, 2013 | Aug 13, 2015 |

**Documentation**

| | | | | |
|---|---|---|---|---|
| 2.18 | Does vessel have all updated publications as listed in the Vessel Inspection Questionnaire, Chapter 2- Question 2.24, as applicable: | Yes | | |
| 2.19 | Owner warrant that vessel is member of ITOPF and will remain so for the entire duration of this voyage/contract: | Yes | | |

| 3. | CREW MANAGEMENT | | | |
|---|---|---|---|---|
| 3.1 | Nationality of Master: | TBA | | |
| 3.2 | Nationality of Officers: | | | |
| 3.3 | Nationality of Crew: | | | |
| 3.4 | If Officers/Crew employed by a Manning Agency - Full style: | Officers: Bernhard Schulte Shipmanagement Hanseatic House 111 Spyrou Araouzou Street. | | |

ORIGINAL

3036 Limassol Cyrpus
Tel: +357 25846400
Telex: NA
Email: Irene.Petallides@bs-shipmanagement.com
Web: www.bs-shipmanagement.com
Crew: Bernhard Schulte Shipmanagement
(Cyprus)
Hanseatic House 111 Spyrou Araouzou Street,
3036 Limassol Cyrpus
Tel: +357 25846400
Telex: NA
Email: Irene.Petallides@bs-shipmanagement.com
Web: www.bs-shipmanagement.com

| | | |
|---|---|---|
| 3.5 | What is the common working language onboard: | English |
| 3.6 | Do officers speak and understand English: | Yes |
| 3.7 | In case of Flag Of Convenience, is the ITF Special Agreement on board: | N/A |

## 4. HELICOPTERS

| | | |
|---|---|---|
| 4.1 | Can the ship comply with the ICS Helicopter Guidelines: | Yes |
| 4.2 | If Yes, state whether winching or landing area provided: | Landing |

## 5. FOR USA CALLS

| | | |
|---|---|---|
| 5.1 | Has the vessel Operator submitted a Vessel Spill Response Plan to the US Coast Guard which has been approved by official USCG letter: | Yes |
| 5.2 | Qualified individual (QI) - Full style: | Witt \| O'Brien's Response Management Inc. 103 Morgan Lane, Ste 103Plainsboro, NJ 08536-3339USA Tel: +1-504-7810804 Fax: +1 985 781 0580 Telex: NA Email: commandcenter@oopsusa.com |
| 5.3 | Oil Spill Response Organization (OSRO) -Full style: | National Response Corporation 3500 Sunrise Highway Suite T103, Great River NY 11739 USA Tel: +1 202 267 2675 Fax: +1-631-224-9082 Telex: n/a Email: clientservices@nrcc.com |
| 5.4 | Has technical operator signed the SCIA / C-TPAT agreement with US customs concerning drug smuggling: | Yes |

## 6. CARGO AND BALLAST HANDLING

### Double Hull Vessels

| | | |
|---|---|---|
| 6.1 | Is vessel fitted with centerline bulkhead in all cargo tanks: | No |
| 6.2 | If Yes, is bulkhead solid or perforated: | Solid |

### Cargo Tank Capacities

| | | |
|---|---|---|
| 6.3 | Capacity (98%) of each natural segregation with double valve (specify tanks): | Seg#1: 110154 m3 (1w,4w,3c,slop P) Seg#2: 116046 m3 (1c,2c,3w,5w) Seg#3: 107845 m3 (2w,4c,5c,Slop s) |
| 6.4 | Total cubic capacity (98%, excluding slop tanks): | 321947.7 m3 |
| 6.5 | Slop tank(s) capacity (98%): | 12097 m3 |


| | | | | |
|---|---|---|---|---|
| 6.6 | Residual/Retention oil tank(s) capacity (98%), if applicable: | | | m3 |
| 6.7 | Does vessel have Segregated Ballast Tanks (SBT) or Clean Ballast Tanks (CBT): | | SBT | |

### SBT Vessels

| | | | |
|---|---|---|---|
| 6.8 | What is total capacity of SBT? | | 107014.1 m3 |
| 6.9 | What percentage of SDWT can vessel maintain with SBT only: | | 34.9 % |
| 6.10 | Does vessel meet the requirements of MARPOL Annex I Reg 18.2: (previously Reg 13.2) | Yes | |

### Cargo Handling

| | | | |
|---|---|---|---|
| 6.11 | How many grades/products can vessel load/discharge with double valve segregation: | 3 | |
| 6.12 | Maximum loading rate for homogenous cargo per manifold connection: | | 14300 m3/hr |
| 6.13 | Maximum loading rate for homogenous cargo loaded simultaneously through all manifolds: | | 26500 m3/hr |
| 6.14 | Are there any cargo tank filling restrictions. If yes, please specify: | N/A | |

### Pumping Systems

| 6.15 Pumps: | No. | Type | Capacity |
|---|---|---|---|
| Cargo: | 3 | Centrifugal | 5600 M3/HR |
| | 1 | Centrifugal | 1500 M3/HR |
| Stripping: | 1 | Reciprocating | 400 m3/hr |
| Eductors: | 2 | Venturi | 600 m3/hr |
| Ballast: | 2 | Centrifugal | 3500 m3/hr |

| | | | |
|---|---|---|---|
| 6.16 | How many cargo pumps can be run simultaneously at full capacity: | 3 | |

### Cargo Control Room

| | | | |
|---|---|---|---|
| 6.17 | Is ship fitted with a Cargo Control Room (CCR): | Yes | |
| 6.18 | Can tank innage / ullage be read from the CCR: | Yes | |

### Gauging and Sampling

| | | | |
|---|---|---|---|
| 6.19 | Can ship operate under closed conditions in accordance with ISGOTT: | Yes | |
| 6.20 | What type of fixed closed tank gauging system is fitted: | Radar | |
| 6.21 | Are overfill (high-high) alarms fitted? If Yes, indicate whether to all tanks or partial: | All tanks | |

### Vapor Emission Control

| | | | |
|---|---|---|---|
| 6.22 | Is a vapor return system (VRS) fitted: | Yes | |
| 6.23 | Number/size of VRS manifolds (per side): | 2 | 400 mm |

### Venting

| | | | |
|---|---|---|---|
| 6.24 | State what type of venting system is fitted: | Common | |

### Cargo Manifolds

| | | | |
|---|---|---|---|
| 6.25 | Does vessel comply with the latest edition of the OCIMF 'Recommendations for Oil Tanker Manifolds and Associated Equipment': | Yes | |
| 6.26 | What is the number of cargo connections per side: | 3 | |
| 6.27 | What is the size of cargo connections: | | 500 mm |
| 6.28 | What is the material of the manifold: | STPY 400 | |



## Manifold Arrangement

| | | |
|---|---|---|
| 6.29 | Distance between cargo manifold centers: | 3000 mm |
| 6.30 | Distance ships rail to manifold: | 4275 mm |
| 6.31 | Distance manifold to ships side: | 4600 mm |
| 6.32 | Top of rail to center of manifold: | 750 mm |
| 6.33 | Distance main deck to center of manifold: | 2100 mm |

6.34 Manifold height above the waterline in normal ballast / at SDWT condition:  22.56 m     10.87 m

6.35 Number / size reducers:
6 x 500/400mm (20/16")
3 x 500/300mm (20/12")
3 x 500/250mm (20/10")

## Stern Manifold

| | | |
|---|---|---|
| 6.36 | Is vessel fitted with a stern manifold: | No |
| 6.37 | If stern manifold fitted, state size: | 0 mm |

## Cargo Heating

| | | |
|---|---|---|
| 6.38 | Type of cargo heating system? | Steam Coil |
| 6.39 | If fitted, are all tanks coiled? | No |
| 6.40 | If fitted, what is the material of the heating coils: | Mild Steel |
| 6.41 | Maximum temperature cargo can be loaded/maintained: | 65.0 °C / 149.0 °F     0 °C / 32 °F |

## Tank Coating

| 6.42 Are cargo, ballast and slop tanks coated? | Coated | Type | To What Extent |
|---|---|---|---|
| Cargo tanks: | Yes | Coal Tar Epoxy | Partially Coated Tanks (Main Cargo) Bottoms + 300mm up vertical sides & Top + 1.5m down vertical sides |
| Ballast tanks: | Yes | Epoxy | Whole Tank |
| Slop tanks: | Yes | Coal Tar Epoxy | Whole Tank |

6.43 If fitted, what type of anodes are used:   Zinc

## 7. INERT GAS AND CRUDE OIL WASHING

| | | |
|---|---|---|
| 7.1 | Is an Inert Gas System (IGS) fitted: | Yes |
| 7.2 | Is IGS supplied by flue gas, inert gas (IG) generator and/or nitrogen: | Flue Gas |
| 7.3 | Is a Crude Oil Washing (COW) installation fitted: | Yes |

## 8. MOORING

| 8.1 Mooring wires (on drums) | No. | Diameter | Material | Length | Breaking Strength |
|---|---|---|---|---|---|
| Forecastle: | 6 | 40 mm | 6 x 36 IWRC | 275 m | 103 MT |
| Main deck fwd: | 4 | 40 mm | 6 x 36 IWRC | 275 m | 103 MT |
| Main deck aft: | 4 | 40 mm | 6 x 36 IWRC | 275 m | 103 MT |
| Poop deck: | 6 | 38 mm | 6 x 36 IWRC | 275 m | 103 MT |

| 8.2 Wire tails | No. | Diameter | Material | Length | Breaking Strength |
|---|---|---|---|---|---|
| Forecastle: | 6 | 80 mm | Euroflex | 11 m | 158.00 MT |


| | | | | | |
|---|---|---|---|---|---|
| Main deck fwd: | 4 | 80 mm | Euroflex | 11 m | 158.00 MT |
| Main deck aft: | 4 | 80 mm | Euroflex | 11 m | 158.00 MT |
| Poop deck: | 6 | 80 mm | Euroflex | 11 m | 158.00 MT |

| 8.3 | Mooring ropes (on drums) | No. | Diameter | Material | Length | Breaking Strength |
|---|---|---|---|---|---|---|
| | Forecastle: | | mm | | m | MT |
| | Main deck fwd: | | mm | | m | MT |
| | Main deck aft: | | mm | | m | MT |
| | Poop deck: | | mm | | m | MT |

| 8.4 | Other mooring lines | No. | Diameter | Material | Length | Breaking Strength |
|---|---|---|---|---|---|---|
| | Forecastle: | 2 | 64 mm | Lankhorst HSPP 8 Strand | 220 m | 75.00 MT |
| | Main deck fwd: | | mm | | m | MT |
| | Main deck aft: | | mm | | M | MT |
| | Poop deck: | 2 | 68 mm | Synthetic Fibre | 220 m | 116.30 MT |

| 8.5 | Mooring winches | | No. | # Drums | Brake Capacity |
|---|---|---|---|---|---|
| | Forecastle: | | 3 | Double Drum | 61.8 MT |
| | Main deck fwd: | | 2 | Double Drum | 61.8 MT |
| | Main deck aft: | | 2 | Double Drum | 61.8 MT |
| | Poop deck: | | 3 | Double Drum | 61.8 MT |

| 8.6 | Mooring bitts | | No. | SWL |
|---|---|---|---|---|
| | Forecastle: | | 3 | 115 MT |
| | Main deck fwd: | | 6 | 115 MT |
| | Main deck aft: | | 6 | 115 MT |
| | Poop deck: | | 6 | 115 MT |

| 8.7 | Closed chocks and/or fairleads of enclosed type | | No. | SWL |
|---|---|---|---|---|
| | Forecastle: | | 13 | 136 MT |
| | Main deck fwd: | | 14 | 136 MT |
| | Main deck aft: | | 14 | 136 MT |
| | Poop deck: | | 20 | 136 MT |

**Emergency Towing System**

| 8.8 | Type / SWL of Emergency Towing system forward: | Smit Bracket | 200 MT |
|---|---|---|---|
| 8.9 | Type / SWL of Emergency Towing system aft: | M.E.T.S | 200 MT |

**Anchors**

| 8.10 | Number of shackles on port cable: | 14 |
|---|---|---|
| 8.11 | Number of shackles on starboard cable: | 14 |

**Escort Tug**

| 8.12 | What is SWL and size of closed chock and/or fairleads of enclosed type on stern: | 204 MT | 600 x 450 |
|---|---|---|---|
| 8.13 | What is SWL of bollard on poopdeck suitable for escort tug: | | 115 MT |

**Bow/Stern Thruster**

| 8.14 | What is brake horse power of bow thruster (if fitted): | bhp | 0 Kw |
|---|---|---|---|
| 8.15 | What is brake horse power of stern thruster (if fitted): | bhp | 0 Kw |

**Single Point Mooring (SPM) Equipment**

| 8.16 | Does vessel comply with the latest edition of OCIMF | Yes |
|---|---|---|



'Recommendations for Equipment Employed in the
Mooring of Vessels at Single Point Moorings (SPM)':

| | | |
|---|---|---|
| 8.17 | Is vessel fitted with chain stopper(s): | Yes |
| 8.18 | How many chain stopper(s) are fitted: | 2 |
| 8.19 | State type of chain stopper(s) fitted: | Tongue |
| 8.20 | Safe Working Load (SWL) of chain stopper(s): | 200 MT |
| 8.21 | What is the maximum size chain diameter the bow stopper(s) can handle: | 76 mm |
| 8.22 | Distance between the bow fairlead and chain stopper/bracket: | 3400 mm |
| 8.23 | Is bow chock and/or fairlead of enclosed type of OCIMF recommended size (600mm x 450mm)? If not, give details of size: | Yes |

### Lifting Equipment

| | | |
|---|---|---|
| 8.24 | Derrick / Crane description (Number, SWL and location): | Cranes: 2 x 20 Tonnes Port and Starboard |
| 8.25 | What is maximum outreach of cranes / derricks outboard of the ship's side: | 20 m |

### Ship To Ship Transfer (STS)

| | | |
|---|---|---|
| 8.26 | Does vessel comply with recommendations contained in OCIMF/ICS Ship To Ship Transfer Guide (Petroleum or Liquified Gas, as applicable): | Yes |

## 9. MISCELLANEOUS

### Engine Room

| | | | |
|---|---|---|---|
| 9.1 | What type of fuel is used for main propulsion? | HFO 380 CST | |
| 9.2 | What type of fuel is used in the generating plant? | HFO | |
| 9.3 | Capacity of bunker tanks - IFO and MDO/MGO: | 7650.2 m3 | 500.3 m3 / 0 m3 |
| 9.4 | Is vessel fitted with fixed or controllable pitch propeller(s)? | Fixed | |

### Insurance

| | | |
|---|---|---|
| 9.5 | P & I Club - Full Style: | The Britannia Steam Ship Insurance Association Limited Regis House, 45, King William Street, London, EC4R 9AN U.K. Tel: +442074073588 Fax: +442074033942 Web: www.britanniapandi.com |
| 9.6 | P & I Club coverage - pollution liability coverage: | 1000000000 US$ |

### Port State Control

| | | |
|---|---|---|
| 9.7 | Date and place of last Port State Control inspection: | Dec 18, 2012 / Long Beach |
| 9.8 | Any outstanding deficiencies as reported by any Port State Control: | No |
| 9.9 | If yes, provide details: | |

### Recent Operational History

| | | |
|---|---|---|
| 9.10 | Has vessel been involved in a pollution, grounding, serious casualty or collision incident during the past 12 months? If yes, full description: | Pollution: No , Grounding: No , Serious casualty: No , Collision: No , |
| 9.11 | Last three cargoes / charterers / voyages (Last / 2nd Last / | Contact owner for details |



3rd Last):

9.12 Date/Place of last SIRE Inspection:

9.13 Date/Place of last CDI Inspection:

9.14 Recent Oil company inspections/screenings (To the best of     Contact owner for details.
owners knowledge and without guarantee of acceptance
for future business)*:

*Blanket "approvals" are no longer given by Oil Majors and
ships are accepted for the voyage on a case by case basis.

Version 3 (INTERTANKO / Q88.com)



# ENCLOSURE 2: Speed and Consumptions

| VESSEL NAME: | M.T.PURPOSE |
|---|---|
| Date Updated: | 24.07.2017 |

| BALLAST | | | | | |
|---|---|---|---|---|---|
| SPEED(KTS) | RPM | CONSUMPTION (MTs) | | | |
| | | M/E | A/Blr | D/G | TOTAL |
| 4.20 | 24.0 | 13.00 | 1.50 | 5.90 | 20.40 |
| 8.30 | 40.0 | 21.60 | 1.50 | 5.90 | 29.00 |
| 11.00 | 53.0 | 37.60 | 0.00 | 5.90 | 43.50 |
| 13.5 | 66.0 | 67 | 0 | 4.5 | 71.50 |
| 7 | | | | | 0.00 |
| 7.5 | 37.0 | 23.00 | 1.50 | 5.90 | 30.40 |
| 8 | 39 | 24.1 | 1.5 | 5.9 | 31.50 |
| 8.5 | 41 | 25.3 | 1.5 | 5.9 | 32.70 |
| 9 | 43 | 26.6 | 1 | 5.9 | 33.50 |
| 9.5 | 46 | 30.1 | 0.5 | 5.9 | 36.50 |
| 10 | 48 | 33.1 | 0 | 5.9 | 39.00 |
| 10.5 | 51.0 | 36.1 | 0 | 5.9 | 42.00 |
| 11 | 53.0 | 40.6 | 0 | 5.9 | 46.50 |
| 11.5 | 55.0 | 45.6 | 0 | 5.9 | 51.50 |
| 12 | 58.0 | 47.1 | 0 | 5.9 | 53.00 |
| 12.5 | 60.0 | 53.0 | 0 | 4.5 | 57.50 |
| 13 | 63.0 | 58.5 | 0 | 4.5 | 63.00 |
| 13.5 | 65.0 | 63.5 | 0 | 4.5 | 68.00 |
| 14 | 67.0 | 71.0 | 0 | 4.5 | 75.50 |

| LADEN | | | | | | Running Status | | | REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| SPEED (KTs) | RPM | CONSUMPTION (MTs) | | | | No of DG | A/Blwr | Blr/EGB | |
| | | M/E | A/Blr | D/G | TOTAL | | | | |
| 4.00 | 24.0 | 14.00 | 1.50 | 5.90 | 21.40 | 2 | ON | BLR | Dead Slow Ahead |
| 8.10 | 40.0 | 26.00 | 1.50 | 5.90 | 33.40 | 2 | ON | BLR | Slow Ahead |
| 10.50 | 53.0 | 45.00 | 0.00 | 5.90 | 50.90 | 2 | ON | EGB | Half Ahead |
| 13 | 66 | 72.00 | 0 | 4.5 | 76.50 | 1 | | EGB | Full Ahead |
| 7 | | | | | 0.00 | | | | Critical RPM Range |
| 7.5 | 37.0 | 26.00 | 1.50 | 5.90 | 33.40 | 2 | ON | BLR | M/E Cons includes 3MT for soot blow |
| 8 | 39 | 28.00 | 1.5 | 5.90 | 35.40 | 2 | ON | BLR | M/E Cons includes 3MT for soot blow |
| 8.5 | 43 | 31.00 | 1 | 5.90 | 37.90 | 2 | | EGB | M/E Cons includes 3MT for soot blow |
| 9 | 45 | 35.00 | 0.5 | 5.90 | 41.40 | 2 | | EGB | M/E Cons includes 3MT for soot blow |
| 9.5 | 48 | 39.00 | 0 | 5.90 | 44.90 | 2 | | EGB | M/E Cons includes 3MT for soot blow |
| 10 | 50 | 43.00 | 0 | 5.90 | 48.90 | 2 | | EGB | M/E Cons includes 3MT for soot blow |
| 10.5 | 53 | 48.00 | 0 | 5.90 | 53.90 | 2 | | EGB | M/E Cons includes 3MT for soot blow |
| 11 | 55 | 53.50 | 0 | 5.90 | 59.40 | 2 | | EGB | M/E Cons includes 3MT for soot blow |
| 11.5 | 58 | 56.00 | 0 | 5.90 | 61.90 | 2 | | EGB | M/E Cons includes 3MT for soot blow |
| 12 | 60 | 62.00 | 0 | 5.90 | 67.90 | 2 | | EGB | |
| 12.5 | 64 | 67.50 | 0 | 4.5 | 72.00 | 1 | | EGB | |
| 13 | 66 | 72.00 | 0 | 4.5 | 76.50 | 1 | | EGB | |
| 13.5 | 68 | 76.50 | 0 | 4.5 | 81.00 | 1 | | EGB | |
| 14 | 70 | 83.00 | 0 | 4.5 | 87.50 | 1 | | EGB | |



| Critical RPM Range: | 29-36 |
| Max RPM: | 75.2 |
| MCR RPM: | 79 |

| Manoeuvering Range | DS.Ahd | 24 |
|---|---|---|
| | S.Ahd | 40 |
| | H.Ahd | 53 |
| | F.Ahd | 66 |

**Other Consumptions** Mt/day

| Port | | Idle | 10.00 |
|---|---|---|---|
| | | Anchor | 10.00 |
| | | Loading | 20.00 |
| | | Disch | 90.00 |
| Aux. Eng (1) | | s/steam | 4.50 |
| Aux. Eng (2) | | w A/Blwr | 5.90 |
| Gasfreeing | | | 40.00 |
| Reinerting | | | 80.00 |
| Wash all Tanks (Approx) | | | 60.00 |
| Tank Heating- *To MAINTAIN* | | | N/A |
| Tank Heating- *To Increase by 5°C* | | | N/A |
| No of days Re Inert All COT: | | | 1.5 |

| Complete Set Spare Magnetic contactors | YES | Date Supplied | |
|---|---|---|---|
| Spare Aux Blower motor provided | YES | Date Supplied | |
| Alpha Lubricator Fitted | YES | Date Installed | |
| Slide Valves Fitted | YES | Date Installed | 24-Nov-08 |
| LSMGO witness by Class | | Date Survey | |
| Last Hull Scrub | 1-Jan-13 | Last propeller polish | Presently vessel in dry dock |

**Note:**
1. Input data only on cells highlighted in yellow
2. For consumption within manoeuvering range pls allow for extra consumption for increaing speed for the soot blowing period.
(For eg. If consumption at half ahead is 20T per day and extra consumption for increaing speed is 3T then log down consumption as 23T)



# ADDENDUM NO. 1

## M/T RIDGEBURY PURPOSE
## T/C DATED AUGUST 18, 2015

## BETWEEN RIDGEBURY MIKE LLC
## And
## SEAWOLF TANKERS INC.

Referring to the Charter Party dated August 18, 2015, by and between Ridgebury Mike LLC, "Owners", and Seawolf Tankers Inc., "Charterers", covering the fixture of the *M/T Ridgebury Purpose*, it is hereby mutually understood and agreed that the following change be included in the Shelltime 4, effective January 1, 2016:

Clause 65 TVEL to be deleted and replaced as follows:

> *Time for conducting COC inspections, or similar Port State inspections, shall be considered a Pool expense. Time will be absorbed by the Pool as long as the vessel passes the COC (or other Port State) inspection.*

> *Should a vessel fail said inspection, or be found deficient, either of which results in a delay to the vessel, then all time commencing from the time of arrival at the port until the time the vessel is passed by the USCG, will be considered as offhire specific to that vessel. If such inspection occurs and vessel fails while discharging, but no time is lost, there will be no offhire.*

All other terms and conditions of the Charter Party shall remain in full force and effect and the Charter Party shall be read and construed as if the terms of this Addendum were included therein by way of addition or substitution, as the case may be.

RIDGEBURY MIKE LLC

By: _____

SEAWOLF TANKERS INC.

By: _____

 ORIGINAL

# AMENDMENT NO. 2
## M/T Ridgebury Purpose
## T/C dated August 18, 2015
## Between Ridgebury Mike LLC
## and
## Seawolf Tankers Inc.

Referring to the Charter Party dated August 18, 2015 by and between Ridgebury Mike LLC, Owners, and Seawolf Tankers Inc., Charterer, covering the fixture of the *M/T Ridgebury Purpose*;

As of March 5, 2018, it is hereby mutually understood and agreed that the banking details in line 108 of the Charter Party be replaced as follows:

Owners banking details:

| | |
|---|---|
| Intermediary Bank: | BNY Mellon |
| | 101 Barclay Street |
| | New York, NY 10286 |
| ABA: | 021000018 |
| | |
| Beneficiary Bank: | DNB Bank ASA |
| | 200 Park Avenue, 31st Floor |
| | New York, NY 10166-0396 |
| Account Number: | 8026001499 |
| | |
| Beneficiary: | RV4 Fleet Finance LLC |
| | 33 Riverside Ave 3rd Floor |
| | Westport, CT 06880 |
| Account Number: | ▮▮▮▮▮▮▮ |

All other terms and conditions to remain the same.

Ridgebury Mike LLC

By: _____

Steven F. Fitzgerald
Atty in Fact

 ORIGINAL

Heidmar Inc., on behalf of
Seawolf Tankers Inc.

By: _____
Kathleen Haines
Treasurer





# SEAWOLF TANKERS INC.
## AMENDMENT NO. 3 TO POOL AGREEMENT

THIS AMENDMENT NO. 3 TO THE POOL AGREEMENT, ("this Amendment") is made as of the 27th day of April 2016, by and among RIDGEBURY MIKE LLC, a limited liability company incorporated under the laws of the Marshall Islands, with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Island MH96960, (the "Participant"), as the owner or operator of the *M/T Ridgebury Purpose,* HEIDMAR INC., a corporation existing under the laws of the Marshall Islands with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH96960 (the "Agent") and SEAWOLF TANKERS INC. a corporation existing under the laws of the Marshall Islands with its registered office at Trust Company Complex, Ajeltake Island, Ajeltake Road, Majuro, Marshall Islands MH96960 (the "Pool").

WHEREAS, the Agent and the Pool have requested and the Participant has agreed to amend certain provisions of the Pool Agreement;

ACCORDINGLY, the parties hereto agree as follows:

Effective April 27, 2016

Section IV, Participant's Undertaking, B) 7), the first sentence to be deleted and replaced as follows:

> To contribute USD 1,700,000 in working capital per vessel.

All other terms and conditions of the Pool Agreement shall remain in full force and effect and the Pool Agreement shall be read and construed as if the terms of this Amendment were included therein by way of addition or substitution, as the case may be.


SEAWOLF TANKERS INC.

By: _____
James Hurley, Managing Director


HEIDMAR INC.

By: _____
Benjamin P. Ognibene
President & CEO


RIDGEBURY MIKE LLC

By: _____
Robert Burke, CEO